LOUIS PEMSTEIN & others, trustees,[1] *vs.* EDWARD S.
STIMPSON, THIRD.

No. 92-P-518.

Worcester. November 8, 1993. - March 28, 1994.

Present: KASS, GREENBERG, & LAURENCE, JJ.

*Guaranty. Real Property,* Mortgage. *Mortgage,* Foreclosure. *Uniform
Commercial Code,* Secured transaction. *Bankruptcy,* Stay of other pro-
ceedings. *Practice, Civil,* Appeal.

Discussion of the statutory norms governing foreclosure of a real estate
  mortgage, with reference to a guaranty of the note secured by the mort-
  gage. [286-289]
As a contract of guaranty is not an "instrument" within the meaning of
  art. 3 of the Uniform Commercial Code, G. L. c. 106, the guarantors of
  a note secured by a first mortgage on a parcel of real property did not
  have the protection afforded by § 3-601 (1) (*b*) of the code with respect
  to impairment of the collateral. [289-290]
Provisions of art. 9 of the Uniform Commercial Code governing secured
  transactions are not applicable to security interests in real property and,
  to the extent a Federal bankruptcy judge, in the exercise of his powers
  over a bankrupt estate, imposed art. 9 standards on the foreclosure of a
  real estate mortgage, the bankruptcy judge's order did not invest an
  unconditional guarantor of the mortgage note with the rights of a
  debtor under art. 9, and his guaranty remained subject to the rules and
  standards applicable under State law to real estate mortgage foreclo-
  sures. [290-292]
In an action on a guarantee of a note secured by a real estate mortgage,
  the jury's finding, in response to a special question, that a foreclosure
  sale of the collateral had not been conducted in a commercially reason-
  able manner did not entitle the guarantor to relief under 11 U.S.C.
  § 362 (h) (1988) for violation of conditions of sale imposed by a Fed-
  eral bankruptcy judge, as relief under that statute is confined to debtors
  and their creditors. [292]
In an action on a guaranty of a note secured by a real estate mortgage, the
  issue of the proper date for valuing the collateral, and thus establishing
  the amount of the deficiency for which the guarantor was liable, was
  not preserved for appellate review. [292-293]

---

[1]Alan Feingold, Manuel Sigel, Harry Friedberg, I. Tutter Burwick, and
N. Bernard Pemstein, all as trustees together with Louis Pemstein of the
Hopedale Realty Trust.

A guarantor of a note remained liable, under his contract of guaranty, for interest and costs accruing after the debtor's filing of a petition under chapter 11 of the Bankruptcy Act, 11 U.S.C. § 301 (1988). [293-294]

CIVIL ACTION commenced in the Superior Court Department on September 19, 1988.

The case was tried before *Elbert Tuttle*, J.

*Michael P. Angelini* for the defendant.

*Philip J. MacCarthy* for the plaintiffs.

KASS, J. On May 14, 1985, Draper Renovation Associates, Inc. (Draper), bought a large mill property (the Draper mill) in Hopedale from the trustees of the Hopedale Realty Trust (the Trust). Draper paid the major portion of the purchase price by giving to the sellers a note for $2,000,000, secured by a first mortgage.[2] As to the obligations of Draper under that note and mortgage, Edward S. Stimpson, III, the president and treasurer of Draper and its major stockholder, gave his unconditional guaranty. In an action on the guaranty brought in Superior Court, Stimpson resisted on the grounds that the Trust, as mortgagee, had impaired the underlying collateral by making a foreclosure sale that was not commercially reasonable. Although a jury returned a verdict, upon special questions, that the Trust had not conducted the foreclosure sale in a commercially reasonable manner, the trial judge reasoned that the standards of art. 9 of the Uniform Commercial Code (G. L. c. 106, § 9-504) had not been imported to land foreclosure in Massachusetts or to the contract of guaranty and, therefore, Stimpson was liable. A judgment in the amount of $3,430,587.90 on the guaranty was entered in favor of the Trust, and from that judgment Stimpson appeals. We affirm.

As might be inferred from the core question of the controversy, i.e., whether Stimpson is liable on his guaranty, Draper's venture turned out ill-timed and ill-fated. In 1987,

---

[2]From a certificate made by the clerk of Draper as to the authority of Draper to mortgage the property, one learns that the total price of the property was $2,500,000.

Draper defaulted in its note payments to the Trust and its real estate tax payments to the town (a default under the mortgage). The Trust initiated foreclosure proceedings on September 15, 1987. Just before a scheduled foreclosure sale, Draper sought the protection of the United States Bankruptcy Court through a petition under chapter 11 of the Bankruptcy Act, 11 U.S.C. § 301 (1988). An automatic stay, 11 U.S.C. § 362($a$)(1) (1988), of foreclosure proceedings went into immediate effect. Draper now had breathing time but its attempts to make an advantageous sale of the mill property were unsuccessful. Owing to Draper's strapped financial condition, maintenance was neglected; the pipes in the mill froze and floors heaved and buckled.

By September, 1988, the Trust was importuning the bankruptcy judge to lift the automatic stay, lest the mill further deteriorate. The Bankruptcy Court did suspend the stay, allowing the Trust to foreclose, but on condition that it conform to the requirements of *In re Gen. Indus., Inc.*, 79 B.R. 124, 131-134 (Bankr. D. Mass. 1987), that the foreclosure sale be conducted in a commercially reasonable manner. While the bankruptcy judge in that decision eschewed suggesting "any precise rules," *id*. at 133, for what constituted a commercially reasonable foreclosure sale, he wrote that adherence to the requirements of G. L. c. 244, §§ 11-17B, and decided Massachusetts cases would not suffice. The foreclosing mortgagee must engage in a marketing campaign using devices such as the hiring of brokers, the dissemination of promotional materials, and display advertising. *Ibid*.

When a public foreclosure sale took place on September 29, 1989, the requirements of Massachusetts law pertaining to the foreclosure of real property were faithfully observed. As to that, there is no dispute. The results were disappointing. Ultimately the only bidder was the Trust, which bought the property for $500,000, subject to liens for unpaid public charges (e.g., real estate taxes) and public utilities. Confronting a substantial deficiency on the bankrupt Draper's note, the Trust turned to Stimpson as guarantor. In the contract action on the guaranty that followed, Stimpson

raised as a principal defense[3] that the foreclosure sale had not been conducted in accordance with a standard of commercial reasonableness. Over the objection of the Trust, the judge put to the jury two special questions: (1) "Was the property sold in a commercially reasonable manner?"; (2) If the first question were answered in the negative, "[W]hat sum would the property have brought if it [had been] sold in a commercially reasonable maner?" Whether those findings would determine the case as matter of law was a question that the judge reserved to himself for decision after the special questions had been answered. The parties concurred in that procedure and briefed the judge on the questions of law after the jury's answers to special questions had been received. The jury answered that the sale had not been conducted in a commercially reasonable manner and that, had the sale been so conducted, the price it would have brought for the property was $2,600,000.

Now the judge turned to the pertinence of those findings as matter of law. He concluded that criteria of commercial reasonableness developed under § 9-504 of the Uniform Commercial Code were not applicable to a real estate foreclosure and that the language of Stimpson's guaranty had waived a defense based on impairment of the collateral by the Trust. In his appeal, Stimpson attacks the determination of his liability and makes two arguments directed to the amount of the judgment.

1. *Availability to guarantor of defense based on impairment of the collateral.*

(a) *Foreclosure norms.* If the statutory norms found in G. L. c. 244, §§ 11-17B, governing foreclosure of real estate mortgages, have been adhered to, Massachusetts cases have generally regarded that as satisfying the fiduciary duty of a mortgagee to deal fairly with the mortgaged property, unless the mortgagee's conduct manifested fraud, bad faith, or the absence of reasonable diligence in the foreclosure sale pro-

---

[3]Stimpson's answer and counterclaims are not in the record appendix. We do know from the docket that he claimed a jury trial and that, at a later stage, the parties stipulated to a dismissal of the counterclaims.

cess. *Sandler* v. *Silk*, 292 Mass. 493, 496 (1935). *West Roxbury Co-op. Bank* v. *Bowser*, 324 Mass. 489, 492 (1949). *Sher* v. *South Shore Natl. Bank*, 360 Mass. 400, 401 (1971). *Fairhaven Sav. Bank* v. *Callahan*, 391 Mass. 1011, 1012 (1984). A low price for the collateral does not by itself indicate bad faith or lack of diligence in disposition of mortgaged real estate. *Chartrand* v. *Newton Trust Co.*, 296 Mass. 317, 320 (1936). *Sher* v. *South Shore Natl. Bank*, *supra* at 402. Nor does such an indication flow from the circumstance that the mortgagee turns out to be the sole bidder at the foreclosure sale. *West Roxbury Co-op. Bank* v. *Bowser*, *supra* at 493. In a survey of the Massachusetts cases, the author of *In re Gen. Indus., Inc.*, 79 B.R. at 132, observed—with dissatisfaction — that "the mortgagee is given much leeway."

On those occasions when the court held a sale invalid, the bad faith or failure of diligence has been of an active and conspicuous character. See, e.g., *Clark* v. *Simmons*, 150 Mass. 357, 361 (1890)(no notice to anyone of adjourned date of foreclosure sale); *Bon* v. *Graves*, 216 Mass. 440, 446-447 (1914)(failure of the mortgage holder to notify interested neighbors of foreclosure sale made it apparent on the record that mortgage holder had acquired the mortgage with the intent to secure the property for himself at his own price); *Sandler* v. *Silk*, 292 Mass. at 497 (no notice to plaintiff, a junior lien holder, who had requested notice and had stated her intention to purchase at a foreclosure sale to protect her investment).

In the instant case the mortgagee, prior to the foreclosure sale, placed prominent advertisements repetitively in The Boston Globe, Banker and Tradesman, The Worcester Telegram, New England Real Estate Journal (inside cover), and The Wall Street Journal (wherein the mill was pitched as a "Fantastic Investment Opportunity"). The mortgagee's representative also alerted real estate brokers and sent out several hundred promotional fliers. A better marketing campaign might have been mounted, as the jury obviously found, but the Trust's efforts satisfied the criteria for fair dealing

and reasonable diligence described in the case law and, indeed, Stimpson seems to concur that the recognized basic Massachusetts statutory and decisional requirements for a lawful foreclosure sale had been met. He argues, however, that the Uniform Commercial Code and the order of the Bankruptcy Court judge demanded more.

(b) *Language of the guaranty.* In its first paragraph, the language of the guaranty executed by Stimpson provides that he "does . . . guarantee to said Trust . . . unconditionally the full and prompt payment . . . of . . . the Promissory Note from [Draper] to the Trust dated this date." In the second paragraph he "waives any and all defenses of a guarantor." Two paragraphs later, the instrument of guaranty speaks more precisely to the subject at hand. It provides that

> "the Trust shall be under no liability or responsibility to the undersigned guarantor to proceed to collect or realize upon any other security . . . an[d] any failure or delay by Trust . . . to collect or proceed to collect and enforce its rights under or in any other security or endorsements furnished to the Trust in connection with any of said obligations or to proceed to enforce its rights against [Draper] or otherwise, shall not affect the liability of the undersigned guarantor hereunder, which is direct and unconditional, and the Trust may proceed to enforce any and all rights which it may have against [Draper] . . . at such time or times and in such manner as it, in its sole discretion, may determine, and in any event the undersigned guarantor and each of them shall be and remain liable under the within guarant[y] for all of said obligations until all of said obligations are paid and performed in full."

Subject always to the limitations of fraud and bad faith, the language of the guaranty allows the Trust to choose the sequence, manner, and means of applying the collateral to Draper's debt and looking to the guarantor for any deficiency. As in *Federal Deposit Ins. Corp.* v. *Hill*, 13 Mass. App. Ct. 514, 518 (1982), the instrument works as an une-

quivocal waiver of any right the guarantor may have had to be discharged under G. L. c. 106, § 3-606(1)(*b*), a statutory provision to which we shall turn our attention next. See *National Acceptance Co. of America* v. *Demes*, 24 U.C.C. Reptr. 197, 199-200 (N.D. Ill. 1977). See also *Snelling* v. *State St. Bank & Trust Co.*, 358 Mass. 397, 404 (1970); *Merrimack Valley Natl. Bank* v. *Baird*, 372 Mass. 721, 722, 725 (1977). For the limits of such a waiver in the context of foreclosure of personal property, see *Shawmut Bank, N.A.* v. *Chase*, 34 Mass. App. Ct. 266, 269-271, *S.C.*, 416 Mass. 1008 (1993).

(c) *Application of the Uniform Commercial Code.* There are two sections of the Uniform Commercial Code (the Code) on which Stimpson relies, § 3-601(1)(*b*)[4] and § 9-504(3).[5]

Section 3-606(1)(*b*), as inserted by St. 1957, c. 765, § 1, provides:

> "The holder discharges any *party to the instrument* to the extent that *without such party's consent* the holder . . . unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse" (emphasis supplied).

Prescinding from the question as to what constitutes unjustifiable impairment,[6] Stimpson's guaranty is not an "instrument" within the meaning of art. 3. An instrument under G. L. c. 106, § 3-102(*e*), is a negotiable instrument, but a separate contract of guaranty, i.e., one that is not part of the note, is not a negotiable instrument because it does not contain an unconditional promise to pay a sum certain. G. L. c. 106, § 3-104. *Federal Deposit Ins. Corp.* v. *Hardt*, 646 F. Supp. 209, 212 (C.D. Ill. 1986). Section 606(1)(*b*), there-

---

[4]General Laws c. 106, § 3-606(1)(*b*).

[5]General Laws c. 106, § 9-504(3).

[6]The Reporter's comment to G. L. c. 106, § 3-606(1)(*b*), suggests importation of the art. 9 standard. Uniform Commercial Code § 3-606, comment 5, 2A U.L.A. (Master ed. 1991).

fore, does not protect a guarantor unless the guarantor is also a signatory on the note. *Myers* v. *First State Bank of Sherwood*, 293 Ark. 82, 85 (1987). *Ishak* v. *Elgin Natl. Bank*, 48 Ill. App. 3d 614, 616-617 (1977). *National Bank of Detroit* v. *Alford*, 65 Mich. App. 634, 636-637 (1975). *Crown Life Ins. Co.* v. *LeBonte*, 111 Wis. 2d 26, 39-43 (1983). Under an instrument of guaranty of the sort here executed by Stimpson, "a guarantor makes a contract distinct from the principal obligation and is collaterally liable if the principal fails to perform." *In re Goodman Indus., Inc.*, 21 B.R. 512, 519 (Bankr. D. Mass. 1982). See also Restatement of Security § 141 comment *a*, at 383-384 (1941); 10 Williston on Contracts § 1265 (3d ed. 1967). See also *United States* v. *Anderson*, 366 F.2d 569, 571 (10th Cir. 1966).

Section 9-504(3) of the Code, as appearing in St. 1979, c. 512, § 7, is significant, *if applicable*, because it provides that the sale or disposition of collateral "including the method, manner, time, place and terms must be commercially reasonable." By necessary application of G. L. c. 106, § 9-501(3)(*b*), the rights given to a debtor and the duties imposed on the secured party under § 9-504(3) may not be waived. Those provisions were considered in *Shawmut Worcester County Bank, N.A.* v. *Miller*, 398 Mass. 273, 276-280 (1986), which held that the no-waiver provision of the Code meant what it said *and* that it applied to guarantors. *Id.* at 278, construing G. L. c. 106, § 9-105(*d*).

Stimpson argues that the condition of a commercially reasonable sale imposed by the bankruptcy judge when he allowed the Trust to hold a foreclosure sale of the Draper real estate made applicable to him the jury's answers to the special questions and clothed him with all the rights of a debtor under art. 9 of the Code. Such rights, under *Shawmut Worcester County Bank, N.A.* v. *Miller, supra,* would include absolution from those provisions of the guaranty which allowed the Trust to dispose of the collateral in whatever manner it chose. While the Chapter 11 proceedings gave the bankruptcy judge power over the bankrupt estate, and he could, therefore, impose art. 9 standards on a real estate

foreclosure (as he did in *In re Gen. Indus., Inc.*, 79 B.R. at 132-133), under State law, art. 9 pertains to security interests in personal property and not in real estate.

That art. 9 is not applicable to real estate given as security is stated explicitly in G. L. c. 106, § 9-104(*j*), as appearing in St. 1979, c. 512, § 7, which provides that "[t]his Article does not apply . . . (*j*) [except as to fixtures] to the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder." See also illustration in comment 4 to § 9-102(3),. 3 U.L.A. (Master ed. 1992), in which the reporter says, "This Article is not applicable to the creation of the real estate mortgage." To the extent this aspect of the statute requires judicial explication, see *Chrysler First Bus. Credit Corp.* v. *Feuer*, 27 Mass. App. Ct. 1169, 1169-1170 (1989); *State Natl. Bank of Conn.* v. *Dick*, 164 Conn. 523, 531 (1973); *Lenape State Bank* v. *Winslow Corp.*, 216 N.J. Super. 115, 130-131 (1987). Stimpson, who is not the subject of the bankruptcy proceedings involving the Draper mill, may not embrace § 9-504(3) and his unconditional guarantee is subject to the rules and standards which we have described as generally applicable to real estate mortgage foreclosures. The difference between the State standard of reasonable diligence,[7] discussed above, and the commercially reasonable standard, as developed, for example, in the instant case, is that the State "reasonable diligence" standard inquires whether the sale has been advertised at least as required by statute, whether the proceedings have been open, and whether notice of foreclosure sale has been given to obviously interested parties, especially those who have manifested interest. The "commercially reasonable" standard, as we have seen in this case, produces inquiry into the competence and aggressiveness of the marketing effort. As the bankruptcy judge expressed it in a memorandum and order issued in connection with this case on February 2, 1990, "[S]tate law [relating to real estate foreclosure] requires only minimal advertising and sales efforts." Adherence to established

---

[7] There has never been a suggestion of fraud or bad faith on the part of the Trust in disposing of the collateral.

standards of reasonable diligence in connection with real estate foreclosures commends itself, as well, as matter of policy. It would not fulfil the reasonable expectations of lenders or borrowers to have, after every real estate foreclosure sale, a postlude of litigation about whether the presale marketing effort had been sufficiently astute and aggressive.

(d) *Pertinence of 11 U.S.C. § 362(h)*. Stimson advances the argument that as the jury found the foreclosure sale had not been conducted in a commercially reasonable manner, the terms of the Bankruptcy Court's dispensation from the automatic stay had been violated, and that he, Stimson, was entitled to relief under 11 U.S.C. § 362(*h*) (1988). That section provides, "An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."

Aside from how Stimpson may claim damages after having given up all his counterclaims, he faces the additional difficulty that relief under § 362(*h*) is confined to debtors and their creditors. *In re Globe Inv. & Loan Co.*, 867 F.2d 556, 559-560 (9th Cir. 1989). *In re Prairie Trunk Ry.*, 112 B.R. 924, 929-931 (Bankr. N.D. Ill. 1990). If we assume that Draper, as the bankrupt, is entitled to claim whatever benefits could be found to flow to it from the conditions placed on the sale by the Bankruptcy Court judge, those benefits do not extend to Stimpson as guarantor. The arm of the bankruptcy judge does not stretch out to protect the guarantor, who is neither the debtor nor, at that point, a creditor of the bankrupt estate. There is also doubt that a claim under § 362(*h*) could be brought before a State court. See *Budget Serv. Co.* v. *Better Homes of Va., Inc.*, 804 F.2d 289, 292 (4th Cir. 1986); *In re Elegant Concepts Ltd.*, 67 B.R. 914, 917 (Bankr. E.D.N.Y. 1986).

2. *Valuation date for purposes of establishing the deficiency*. When the Trust asked the Bankruptcy Court judge for relief from the automatic stay to enable it to foreclose on the mill, it pressed the necessity of selling the property by December, 1988, so that the property might be spared the

ravages of another winter. During the preceding year the debtor had been engaged in a private sale that ultimately fell through. On appeal, Stimpson argues that as the Trust had urged that the property should be sold by December, 1988, the Trust must take the value of the property at that time as the basis for establishing the deficiency on the note, rather than what was paid at the foreclosure.

Not the least of Stimpson's difficulties with this proposition is that it was not, so far as we can see, called to the attention of the trial judge. It may not, therefore, be raised on appeal. *Madan* v. *Royal Indem. Co.*, 26 Mass. App. Ct. 756, 765 (1989). To that we may add that the idea that a party will be estopped by its representations in a judicial forum pertains to contradictory positions taken in a subsequent proceeding involving the same issues and the same parties. To have encountered delays in foreclosing is not the taking of a contradictory position and Stimpson, as an individual, was not a party in the proceedings in the Bankruptcy Court. See *Larson* v. *Larson*, 30 Mass. App. Ct. 418, 427-428 (1991); *Correia* v. *DeSimone*, 34 Mass. App. Ct. 601, 603-604 (1993).

3. *Liability for interest and costs after bankruptcy petition.* Stimpson argues that his guaranty cannot encompass any amounts which the primary debtor does not owe. As interest and costs on the debtor's debts were frozen as of the filing of the chapter 11 petition, Stimpson reasons that he, as guarantor, is also relieved of post-petition interest and costs. A chapter 11 petition and the automatic stay that follows operate only in favor of the debtor. *Pitts* v. *Unarco Indus., Inc.*, 698 F.2d 313, 314 (7th Cir. 1983). Guarantors are still liable on the entire original primary debt, notwithstanding the debtor's chapter 11 petition and notwithstanding confirmation of a plan that reduced the corporate debtor's debt to the creditor. *United States* v. *Stribling Flying Serv., Inc.*, 734 F.2d 221, 223-224 (5th Cir. 1984). See also *United States* v. *Anderson,* 366 F.2d at 571; *In re American Hardwoods, Inc.*, 885 F.2d 621, 625-626 (9th Cir. 1989); *In re Sure-Snap Corp.*, 983 F.2d 1015, 1019 (11th Cir. 1993); *In*

*re Scranes, Inc.*, 67 B.R. 985, 989 (Bankr. N.D. Ohio 1986);
*Bel-Ken Assocs. Ltd. Partnership* v. *Clark*, 83 B.R. 357, 358
(Bankr. D. Md. 1988).

*Judgment affirmed.*