**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Lowell Institution for Savings, Plaintiff,**

v.

**Paul A. VILLEMAIRE, George M. Psoinos and Malcolm F. Fryer, Jr., as Trustees of Dye House Realty Trust, Malcolm F. Fryer, Jr. and Arthur J. Simensen, Defendants.**

No. 91–12520–PBS.

United States District Court, D. Massachusetts.

May 6, 1994.

James R. DeGiacomo, Jacqueline Holmes Haley, Judith K. Wymen, Roche, Carens & DeGiacomo, Boston MA, for plaintiff.

Malcolm F. Fryer, Jr., pro se.

Arthur J. Simensen, pro se.

## MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

SARIS, District Judge.

The plaintiff, Federal Deposit Insurance Corporation ("FDIC"), as Receiver for Lowell Institution for Savings ("LIFS"), brought this action to collect on three promissory notes and guarantees executed by the defendants Paul A. Villemaire, George M. Psoinos and Malcolm F. Fryer, Jr., as Trustees of Dye House Realty Trust, and by Malcolm F. Fryer, Jr. and Arthur J. Simensen, individually.

The FDIC has filed a motion for summary judgment on Counts I–V of its claims and Counts I–VII of the defendants' counterclaims. Villemaire and Psoinos have not opposed the motion. Fryer and Simensen, acting pro se, have opposed the motion on essentially three grounds, that the bank: (1) made certain oral misrepresentations to them; (2) breached the terms and conditions of a written commitment letter; and (3) failed to obtain fair purchase values for the properties foreclosed on. After hearing and review of all the submissions, the Court **ALLOWS** the FDIC's motion for summary judgment.[1]

### FACTUAL BACKGROUND

For purposes of summary judgment the Court treats the following facts as undisputed. Additional facts are included, where appropriate, in the discussion section that follows.

In 1987, Fryer and Simensen were the real estate brokers for a building which in the 1900's had become the dye house for a major textile mill in Lowell, Massachusetts. Because the building was adjacent to the University of Lowell, Fryer and Simensen launched a project to create a retail and restaurant complex in the dye house building. The entity formed to develop the building, the Dye House Realty Trust ("Dye House"), entered into a Construction Loan Agreement with LIFS on February 8, 1988. Villemaire and Fryer, in their capacities as Trustees of Dye House, executed and delivered to LIFS a promissory note in the amount of $2,600,000, payable on demand, with interest payable monthly at a rate equal to 2% greater than the prime rate. Fryer and Simensen also executed unconditional personal guarantees, rendering them jointly and severally liable for the full amount of the note.

Over the next year, Simensen attempted to locate prospective tenants for the project. In January, 1989, Simfry, Inc. entered into a lease with Dye House for 6,350 square feet of space to be used as a restaurant called Banners. In March, 1989, Dye House received a commitment from Marblerock Cinema Corporation to lease approximately 7,200 square feet for a cinema. With these two tenants, the building was approximately 33% leased. Later that year, in November of 1989, Dye House entered into a lease commitment with Gordo Enterprises for 13,684 square feet of space.

In the meantime, construction continued and costs ran higher than Dye House had anticipated. Revised estimates indicated that the cost of the project had increased from an original budget of about $3.2 million to about $5.2 million dollars. LIFS, which had been kept apprised of the increased costs throughout this period, agreed to provide Dye House with a second loan worth $500,000. On or about April 24, 1989, Fryer and Psoinos, in their capacities as Trustees of Dye House, executed a promissory note in favor of LIFS for $500,000, payable on demand, with interest payable monthly at a rate equal to 2% greater than the prime rate. Fryer and Simensen once again executed unconditional personal guarantees of the note, rendering them jointly and severally liable for the full amount.

In addition, on or about May 25, 1989, Fryer in his individual capacity executed a promissory note in favor of LIFS for $300,000, in exchange for a loan of the same amount. This note was also payable on demand, with interest payable monthly at the prime rate plus 2%. The note was secured by second mortgages on Fryer's two homes: a house in Westford, Massachusetts, and a condominium in Moultonboro, New Hampshire.

In August, 1989, Fryer and Simensen informed LIFS representatives that an additional $1,100,000 in funding would be needed to complete construction. On October 10, 1989, LIFS issued Dye House a commitment letter for a new $1.15 million dollar loan. For reasons that are disputed, this loan was never executed and the funds were not advanced.

---

1. The Court allowed FDIC's motion to dismiss Simensen's counterclaims on October 14, 1993, which was unopposed.

The parties agree that no payments were made on the $2,600,000 note after July 14, 1989, or on the $300,000 note after May 25, 1989. On December 26, 1989, LIFS sent demand letters to Dye House and the individual defendants, stating they were in default on the $2,600,000 and $500,000 Notes and Guarantees, and demanding payment of all outstanding sums owed. In addition, on January 25, 1990, LIFS notified Fryer that he was in default on the $300,000 Note and demanded immediate payment.

In the ensuing months, LIFS foreclosed on each of the secured properties. The bank purchased the Dye House property for $1,000,000 at a foreclosure sale in June, 1990. Prior to the sale, LIFS had contracted for two appraisals relevant to the present action. In February, 1990, four months before the sale, Simmons Associates valued the property at $1,400,000. Thirteen months before the sale, in May, 1989, Real Property Specialists had valued the property at $4,263,000.

The residence owned by Fryer in Moultonboro, New Hampshire was purchased by LIFS for $285,000 in April, 1990. Fryer contends this property was valued at $385,000. An appraisal conducted by the bank in February, 1990 valued the property at $340,000. LIFS purchased the Westford, Massachusetts property for $171,000 at a foreclosure sale in November, 1990. Fryer believed the Westford property was worth $320,000.

The present suit was filed by LIFS on March 5, 1990, in Middlesex Superior Court. On August 30, 1991, LIFS was declared insolvent and the FDIC named as Receiver. The case was removed to this court on September 27, 1991.

The FDIC now seeks summary judgment on all five counts of the complaint and each of the defendants' seven counterclaims. Counts I and II of the complaint seek recovery from the Trustees for breach of the $2,600,000 and $500,000 Notes, Counts IV and V seek recovery from Fryer and Simensen in their capacity as guarantors, and Count III is against Fryer individually for the $300,000 Note. The defendants assert counterclaims for breach of agreement, promissory estoppel, specific enforcement, breach of good faith and fair dealing, fraudulent or negligent misrepresentation, declaratory judgment, and alleged violations of Mass.Gen.L. ch. 93A.

## DISCUSSION

A motion for summary judgment must be granted if:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir.1990). If this is accomplished, the burden then "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party]." *Id.* (citations omitted). The nonmovant cannot simply rest upon mere allegations. *Id.* Instead, the nonmoving party must adduce specific, provable facts which establish that there is a triable issue. *Id.* "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986)).

The starting point in the analysis is with the Notes and Guarantees themselves. Due to the relative simplicity of the issues usually involved, suits to enforce promissory notes and guarantees are particularly appropriate for disposition by summary judgment. *Resolution Trust Corp. v. Marshall,* 939 F.2d 274, 276 (5th Cir.1991); *United States Trust Co. of New York v. Herriott,* 10 Mass.App.Ct. 313, 320, 407 N.E.2d 381 (1980). Such a disposition in this case is supported by several basic considerations: the defendants signed and executed the documents; the terms of payment are clear and unambiguous; the bank determined the defendants

had defaulted; and the FDIC is the holder of the notes.

Confronted with this disadvantageous set of circumstances, the defendants argue that the bank breached its duty of good faith and fair dealing in essentially three ways: (1) by making certain oral misrepresentations to them; (2) by breaching the commitment letter issued on October 10, 1989; and (3) by failing to obtain fair purchase values for the foreclosed properties.

## A. Oral Misrepresentations

■ Defendants' first argument is governed by the principles of the *D'Oench* doctrine. *See D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) ("*D'Oench*"); 12 U.S.C. § 1823(e) (Supp.1992). In *D'Oench*, 315 U.S. at 460–61, 62 S.Ct. at 680–81, "[t]he Supreme Court announced a federal common law doctrine of equitable estoppel preventing the borrower from using a 'secret agreement' with the original lender as a defense to the FDIC's demand for payment." *In re 604 Columbus Ave. Realty Trust*, 968 F.2d 1332, 1344 (1st Cir.1992). The common law doctrine is codified at 12 U.S.C. § 1823(e), which directs that agreements with failed banks are unenforceable against the FDIC unless they meet four non-secrecy requirements. Section 1823(e) (Supp.1992) provides:

> No agreement which tends to diminish or defeat the interest of the Corporation [FDIC] in any asset acquired by it ... either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—(1) is in writing, (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution, (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) has been, continuously, from the time of its execution, an official record of the depository institution.

The *D'Oench* doctrine "bars defenses and affirmative claims whether cloaked in terms of contract or tort, as long as those claims arise out of an alleged secret agreement." *Timberland Design, Inc. v. First Serv. Bank for Sav.*, 932 F.2d 46, 50 (1st Cir.1991).

■ The defendants' primary contention is that their decisions to continue construction on Dye House, pursue potential tenants, continue investing their personal funds, and refrain from seeking alternative means of financing the project, were made in reliance on representations by LIFS Officers that the bank would continue funding the Dye House project. For instance, the defendants contend that in October of 1988, after it became clear the project would cost about $2 million more than anticipated, Vice President James Moriarty told the defendants that the bank would provide the additional $1.8 million in financing they needed and find other banks to participate in the lending. In February, 1989, at a meeting with bank officials, Vice President Chester Szablak said the bank could handle all the additional lending. On April 10, 1989, Moriarty allegedly called to say that the bank president, Frank MacDougal, had approved the additional loan. The defendants claim that the $500,000 loan made on April 24, 1989, was supposed to be followed by additional funding. Accordingly, the defendants essentially contend, the decision made by the bank on May 18, 1993, to suddenly reverse its policy and declare that it would provide no additional financing, without any prior warning, constituted a breach of good faith and fair dealing.

This argument, based entirely on oral representations allegedly made by the bank, is barred by § 1823(e). Similar arguments are routinely asserted and rejected. *See, e.g., Timberland*, 932 F.2d at 47–48 (FDIC granted summary judgment, pursuant to *D'Oench* doctrine, where borrowers who borrowed $4 million alleged that bank reneged on oral agreement to lend an additional $3.9 million in the future); *Federal Deposit Ins. Corp. v. Burger*, 631 F.Supp. 1141, 1143 (D.Kan.1986) (FDIC granted summary judgment, pursuant to *D'Oench* doctrine, where bank allegedly informed borrower that loan of $50,000 would be "the first step in long-term financing.").

The defendants attempt to avoid a similar fate by characterizing each of the bank's misrepresentations or misdeeds as a breach of its duty of good faith and fair dealing. Under Massachusetts law, every contract contains an implied covenant of good faith and fair dealing, providing that neither party will do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract. *Anthony's Pier Four, Inc. v. HBC Assocs.,* 411 Mass 451, 471–73, 583 N.E.2d 806 (1991). The defendants contend their counterclaims "are not based on any 'secret agreements' or 'oral understandings,' but are based on the Bank's breach of the covenant of good faith implicit in the Loan Agreements." Since their argument is grounded in a provision of the written loan agreements, albeit an implied provision, the defendants contend that § 1823(e) does not bar their argument that the bank breached an oral agreement to make future loans. *See Texas Refrigeration Supply, Inc. v. Federal Deposit Ins. Corp.,* 953 F.2d 975, 981 (5th Cir.1992) (because, under the Texas UCC, every promissory note has implied obligations concerning acceleration of loans and reasonableness of foreclosure sales, and because these two implied obligations are an integral element of the relationship between borrower and lender, "they cannot be said to be secret or unwritten in the *D'Oench Duhme* sense.").

This argument is not persuasive. Pursuant to § 1823(e), the defendants' claims and defenses based on a breach of the implied covenant of good faith cannot withstand summary judgment because they are predicated solely on alleged oral agreements or representations. *See Lake Forest Dev. v. Federal Deposit Ins. Corp.,* 989 F.2d 197, 201 (5th Cir.) ("[borrower] cannot, consistent with *D'Oench, Duhme,* seek to prove a breach of good faith or fiduciary duty by relying on these alleged [oral] representations that are contrary to the written loan agreement."), *cert. denied,* —— U.S. ——, 114 S.Ct. 385, 126 L.Ed.2d 334 (1993); *In re Beitzell & Co.,* 163 B.R. 637, 652 (D.D.C.1993) ("even if [borrower] is able to establish that a·duty to act in good faith was owed, [borrower's] claim that the duty was breached cannot be premised solely upon alleged oral agreements or repre-

sentations"); *Federal Deposit Ins. Corp. v. Rusconi,* 808 F.Supp. 30, 43 (D.Me.1992). Even in the primary case relied on by the defendants, *Texas Refrigeration Supply,* 953 F.2d at 983, the court applied the *D'Oench* doctrine to grant summary judgment against the borrowers on a breach of good faith claim because the claim rested on "an oral promise by the bank to do something regarding credit for [borrowers]." Additionally, it stated that under the *D'Oench* doctrine, the borrowers' claim that the bank acted in bad faith in accelerating the maturity of the loan could not rest on an oral agreement or understanding. *Id.* at 982 n. 13.

■ Moreover, the duty of good faith protects contracting parties from actions that would injure the right of a party to receive the fruits of the contract at issue. *See Anthony's Pier Four,* 411 Mass. at 471–72, 583 N.E.2d 806. There was no "right" to future loans embodied in the loan agreements and guarantees at issue here. *Compare Beitzell,* 163 B.R. at 651 (motion to dismiss denied where borrower sought "to imply the obligation of good faith with respect to the exercise of certain rights *provided expressly in the loan documents.*") (emphasis added).

### B. Commitment Letter

■ The defendants contend that the bank breached a written agreement between the parties, memorialized in an October 10, 1989 commitment letter from the bank, to provide additional financing of $1.15 million for the Dye House project. The central dispute between the parties is whether the commitment letter had expired on December 15, 1989, when the alleged breach occurred. Paragraph 35 of the commitment letter provides that if the loan does not close within thirty days of the acceptance of the letter, "the Bank shall have no further obligation to the Borrower in connection with the Loan." The plaintiff contends that pursuant to this provision the letter expired on November 10, 1989.

The defendants assert that the closing date had been extended until December 15, on which date the bank reneged on the original terms of the commitment by imposing as an additional condition of the loan that the de-

fendants obtain "standstill" agreements from the sub-contractors who were already owed money on the project. As grounds for its contention that the commitment letter was still in effect, the defendants rely on a December 1 letter in which the bank expresses its desire to close by December 15 and says that "[s]hould the loan not close by December 15, 1989 *the Bank will not extend the commitment* but rather pursue our legal remedies on now existing debts" (emphasis added). In its December 15 letter, the bank states it is "prepared to extend the closing date to Thursday, December 28, 1989 according to the terms and conditions set forth in the commitment if you can reach a standstill agreement with your trade creditors by the end of next week ..."

Although the December 1 letter does establish a disputed fact issue as to whether the parties agreed to an extension of the time for which the loan could be closed, it provides an extension only until December 15. As the closing was not completed by that date, in the December 15 letter the bank refused to grant a further extension unless standstill agreements were obtained within two weeks. As the extension until December 15 had expired, the imposition of additional conditions did not constitute a breach of the initial commitment letter.

Moreover, under the terms of the commitment letter, the bank was entitled to make alterations in the terms and conditions of the loan even during the period when the commitment letter was effective. Paragraph 16 provides that:

> The Bank or its counsel may require such further instruments, documents or assurances as they may deem necessary to protect the interests of the Bank prior to or at closing or during the term of the Loan and any such document may contain terms or provision in addition to the terms contained in this commitment. To the extent that any such term or provision would materially change the terms of the Loan and/or this commitment letter, such additional terms or provisions shall be subject to the approval of Borrower.

Under the language of this provision, the defendants' assertion that a last minute demand for "standstill" agreements constitutes evidence of bad faith is unavailing. Additionally, considering that Fryer states in his deposition that some sub-contractors had already commenced "actions" against the defendants, the bank could also find authority for the imposition of additional conditions in Paragraph 21, providing that:

> If the Premises or the Borrower shall be the subject of any pending or imminent litigation, or if the Borrower shall be the subject of any bankruptcy, reorganization, or insolvency proceeding or, if in the Bank's sole opinion there shall be any material adverse change in the Borrower's financial condition between the date of this commitment and the date of closing, the Bank shall have the right not to close the Loan.

While the defendants contend that the term "actions" doesn't necessarily mean "lawsuits," nevertheless the bank was authorized to act when a lawsuit was merely "imminent" and not yet initiated, or when in its sole opinion the financial condition of the borrower had worsened. Indeed, the documents submitted by the borrowers themselves indicate that over the fall the amount of the liens, including tax liens, would fairly raise concerns by the bank that the financial status was worsening. In addition, there is no requirement, as suggested by the defendants, that in imposing the "standstill" requirements the bank should have referenced the applicable sections in the commitment letter. Finally, the borrowers produced no admissible evidence that it had obtained or had proffered the title insurance policy required by the commitment letter. Accordingly, defendants have produced no specific, provable facts which establish a triable issue concerning any breach of the terms of the agreement letter or a breach of the covenant of good faith.

### C. Foreclosure Sales

The defendants contend the bank paid inadequate prices and used bad faith appraisals as the basis for the foreclosure sales of Dye House and Fryer's two homes. As outlined earlier in this opinion, the bank's purchase of Dye House in June, 1990, for $1 million,

came four months after the property had been appraised at $1.4 million. Thirteen months prior to sale, it was appraised at approximately $4.2 million. The Moultonboro, New Hampshire house, valued by the defendants at $385,000, sold for $285,000; about 74% of fair market value. The Westford, Massachusetts property, valued by the defendants at $320,000, sold for $171,000; about 54% of fair market value.

Under Massachusetts state law, the defendants have the burden of proving the commercial unreasonableness of the foreclosure sale. *Resolution Trust Corp. v. Carr,* 13 F.3d 425, 429 (1st Cir.1993). Absent evidence of bad faith or improper conduct, mortgagees can buy the collateral at a foreclosure sale as 'cheaply' as possible. *Id.* at 430. "[M]ere inadequacy of price will not invalidate a sale unless it is so gross as to indicate bad faith or lack of reasonable diligence." *Id.* (quoting *Chartrand v. Newton Trust Co.,* 296 Mass. 317, 320, 5 N.E.2d 421 (1936)). "On those occasions when the court held a sale invalid, the bad faith or failure of diligence has been of an active and conspicuous character." *Pemstein v. Stimpson,* 36 Mass.App.Ct. 283, 287, 630 N.E.2d 608 (1994).

Applying this standard, there is insufficient evidence of bad faith to withstand a motion for summary judgment. The defendants make no allegation that the bank failed to adequately publicize the sales, or that the defendants themselves were not notified of the upcoming sales. *Compare Carr,* 13 F.3d at 430 (where foreclosure sale not held until four months after the commencement of foreclosure proceedings, borrower "had all this time to either pay the note, refinance elsewhere, or especially as an experienced businessman and real estate developer, produce a buyer who would pay the price he aspired to achieve.").

The defendants' only basis for asserting bad faith is the inadequacy of the price and the bank's reliance on the $1.4 million appraisal of Dye House. This court concludes that reliance on a detailed, 60 page appraisal of the property conducted four months prior to sale is not bad faith "of an active and conspicuous character." *Pemstein,* 36 Mass.App.Ct. at 287, 630 N.E.2d 608. There is no evidence in the summary judgment record as to why the property value decreased precipitously in nine months. To conclude that it was because of bad faith on the part of the bank, as opposed, for example, to a general decline in real estate values, or the stalled situation with the expansion of the University of Lowell, would be pure speculation. *Contrast Texas Refrigeration Supply,* 953 F.2d at 983 (genuine issue of fact whether sale of all the security for only $20,000, in the face of a valid order to buy only a part of the collateral for over $80,000, was a commercially reasonable disposition of the collateral).

With respect to the Moultonboro and Westford properties, defendants have produced no admissible evidence to support their claim of the true fair value of the real estate. In any event, even if defendant's belief as to value is accurate, a review of Massachusetts case law reveals that the purchase prices paid by LIFS were not so "grossly inadequate" as to preclude summary judgment. *See Carr,* 13 F.3d at 430 (citing cases in which a price deficiency of as much as 39% of fair market value supported the granting of a dispositive motion).

### ORDER

For the foregoing reasons, it is hereby **ORDERED** that FDIC's motion for summary judgment on all counts of its complaint and all counts of the defendants' counterclaims be **ALLOWED.** The FDIC shall submit a form of judgment which reflects the amount due on each of the notes, attorney's fees, and disbursements within 10 days.