Fabricant, Judith, J.
INTRODUCTION
This is a suit on a loan guaranty. Before the Court is the plaintiff lender’s motion for partial summary judgment as to count I of its complaint, which seeks to enforce the defendant’s guaranty of the borrower’s payment obligations. For the reasons that will be explained, the motion will be allowed.
BACKGROUND
The record establishes the following facts as undisputed for purposes of this motion.[1] In March of 2006, the defendants, William Shoaf and David Wickline, along with certain others, initiated a real estate development project in Park City, Utah, known as the Sky Lodge. For that purpose, they formed three entities, Easy Street Holding, LLC (Holding), and its subsidiaries, Easy Street Mezzanine, LLC (Mezzanine), and Easy Street Partners, LLC (Partners) (collectively, the Easy Street entities). Shoaf and Wickline each owned an entity that owned 38.75% of Holding; two other entities collectively owned the remaining 25%.
Wickline negotiated financing arrangements for the project, consisting of two substantial loans, both made on March 30, 2006: $36,779,224 to Partners, from an entity known as WestLB AG (West); and $11,250,000 to Mezzanine, from the plaintiff here, BayNorth Realty Trust Fund VI, L.P. (BayNorth). Shoaf and Wickline, who served as co-managers of the project, both executed a personal guaranty for the BayNorth loan.[2] That guaranty is the subject of this action.
The guaranty recites that it is made “for the purpose of inducing” BayNorth to make the loan; that BayNorth makes the loan “in part in reliance on this Guaranty”; that the guarantors’ liability “is primary, direct and unconditional and may be enforced in full or in part, from time to time, after nonpayment or nonperformance by [Mezzanine] of any of the Obligations,” and that “[u]pon the occurrence of a Full Recourse Event, each Guarantor shall be jointly and severally liable for all of the Obligations . . . under the Loan Documents.” The guaranty defines “Full Recourse Event” to include commencement of bankruptcy proceedings by Mezzanine. The guaranty provides that it “shall notbe impaired by any bankruptcy ... or if for any other reason [Mezzanine]... has no legal obligation to discharge any of the Obligations,” and further that, “No Guarantor shall be released by, and each Guarantor hereby waives any claim, counterclaim or defense based on or otherwise involving, any act or thing that would constitute a legal or equitable discharge, including . . . any other matter that would constitute a defense available to [Mezzanine].” The guaranty states that it “may be amended, and waivers or consents to departures from the provisions hereof may be given, only in a writing signed by the party against which enforcement is sought.” It also provides for payment by the guarantors of “all expenses paid or incurred by the Lender, including, without limitation, attorneys fees and disbursements, in connection with the enforcement of this Guaranty.”
According to Wickline’s affidavit, conflicts arose between himself and Shoaf, relating particularly to cost overruns at the project. Shoaf and the other owners removed Wickline as “co-manager” and denied him access to information about the project. Wickline communicated regarding project issues with BayNorth managing director Charles Flint, in an attempt to avoid adverse action by BayNorth. Wickline provided information to Flint that “was appropriate for [BayNorth] to receive as Easy Street’s lender,” but that “Shoaf had failed or refused to provide. ” Flint expressed gratitude for Wickline’s cooperation, and, according to Wickline’s affidavit, in response to Wickline’s inquiry regarding his guaranty, Flint “stated that [BayNorth] ‘was not Merrill Lynch,’ it did not have to pursue all guarantors, and had the internal flexibility to differentiate between the ‘bad actors’ and those who acted properly in [BayNorth]’s eyes, like Wickline.” Flint, according to Wickline’s affidavit, told Wickline that BayNorth would proceed against Shoaf personally, but “made no such indication that [BayNorth] would be proceeding against Wickline.” Wickline considered it “implicit that Wickline had nothing to fear from [BayNorth] as long as he cooperated”; he understood Flint’s statements to mean that BayNorth “would forgo any action against Wickline on the Guaranties in exchange for his cooperation with [BayNorth], which he provided.”
On or about February 19 or 20, 2008, West transferred $5.6 million to BayNorth from funds West held on behalf of the Easy Street entities. Soon thereafter, West and the Easy Street entities demanded that BayNorth return those funds, asserting that the transfer had been made in error. BayNorth refused to return the funds, relying on a provision of the note that called for prepayment of certain principal and accrued interest under certain circumstances.[3] As a result of the transfer, the amount held by West on behalf of the Easy Street entities fell below that required under the note to West. West declared a default, which in turn constituted a default on the BayNorth loan. BayNorth issued a notice of default, dated May 5,2009, and then issued a notice of acceleration and demand for payment dated June 23, 2009. Receiving no payment, BayNorth scheduled a sale of its security interest for September 16,2009. On September 14,2009, all three Easy Street entities filed for bankruptcy protection in Utah, forestalling the sale and preventing further collection action against them.[4]
BayNorth now seeks to collect Mezzanine’s debt from these defendants under the guaranty. In addition to the principal balance of the loan, BayNorth seeks to collect *504 a “Yield Maintenance Amount” pursuant to section 4.2 of the note. That section provides for circumstances in which “payment of this Note is required pursuant to any provision of the Loan Documents prior to the originally scheduled maturity date . . . including . . . on account of any default.” In that situation, section 4.2 provides, “the Borrower shall immediately pay to the Lender in addition to all other amounts due hereunder, and there shall be due and owing as additional interest, the Yield Maintenance amount . . . not as a penalty but on account of the loss of the Lender’s opportunity to receive the payments of Base Interest and Contingent Interest which otherwise would have been payable through and including the originally scheduled maturity date.” Section 4.2 provides a formula for determining the amount, based on a monthly compounded annual rate of return of thirty percent.According to BayNorth’s calculation, the total amount now due, including the principal balance, accumulated interest, and the yield maintenance amount, less the $5.6 million paid, is $31,204,258. BayNorth also seeks attorneys fees and costs.
DISCUSSION
Summaiy judgment is properly granted when there is no genuine issue as to any material fact, and the moving parly is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c). A fact is material if it would affect the outcome of the case. Carey v. New England Organ Bank, 446 Mass. 270, 278 (2006). A dispute of fact is genuine if the evidence would permit a reasonable fact finder to return a judgment for the non-moving party. Flesner v. Technical Commc’ns Corp., 410Mass. 805, 809 (1991). The moving party may prevail on its motion by demonstrating by reference to materials properly in the summaiy judgment record, unmet by countervailing materials, that the party bearing the burden of proof at trial has no reasonable expectation of proving an essential element of its case. Carey, 446 Mass. at 278, citing Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). To withstand summaiy judgment, the non-moving party must set forth specific facts with affidavits, deposition testimony, answers to interrogatories, or admissions on file showing that a genuine issue of fact exists. Mass.RCiv.P. 56(e); Ng Bros. Constr., Inc. v. Cranney, 436 Mass. 638, 644 (2002).
Here, the record establishes as undisputed that the defendants executed the guaranty; that Mezzanine filed for bankruptcy protection with the loan outstanding, and that the defendants have not paid the amounts demanded. Based on those established facts, BayNorth seeks summaiy judgment. The defendants raise a series of defenses, which the Court will address in turn.
1. Bad Faith.
Defendants contend that a dispute of material fact exists with respect to their claim that BayNorth triggered the borrower’s default by refusing to return the funds erroneously received from the borrower. That refusal, defendants claim, constituted bad faith, which, they argue, is a non-waivable defense to enforcement of the guaranty. On that basis, defendants argue, their liability under the guaranty depends on facts in dispute, and cannot be determined on summary judgment.
The Supreme Judicial Court has held that a waiver of defenses in a loan guaranty is enforceable according to its terms. Cambridgeport Savings Bank v. Boersner, 413 Mass. 432, 443-44 (1992). Defendants argue nevertheless that Massachusetts law recognizes an exception for a defense of bad faith. Having reviewed the cases on which defendants rely, the Court is not convinced that such a broad and generally applicable exception exists.
Defendants rely on Pemstein v. Stimpson, 36 Mass.App.Ct. 283, 288 (1994), and FDIC v. Elder Care Services, Inc., 82 F.3d 524, 526 (1st Cir. 1996). The guarantor in Pemstein sought to avoid liability on the ground that the lender had conducted a foreclosure sale in a manner that did not conform to a standard of commercial reasonableness, resulting in a larger than necessary deficiency. The Court held that standard inapplicable, reading the language of the guaranty as allowing the lender “to choose the sequence, manner, and means of applying the collateral to [the] debt and looking to the guarantor for any deficiency,” “[s]ubject always to the limitations of fraud and bad faith.” Pemstein, 36 Mass.App.Ct. at 288. In FDIC v. Elder Care Services, Inc., which presented a similar dispute, the First Circuit cited Pemstein for the proposition that a waiver of defenses in a guaranty “probably . . . could not immunize bad faith or fraud.” 82 F.3d at 526. The Court assumed, without deciding, that bad faith in the disposition of the collateral would provide a valid defense for the guarantors, but nevertheless affirmed summaiy judgment for the lender, judging the evidence insufficient to create a genuine factual dispute as to bad faith. Id. at 527.[5]
Bad faith in the disposition of collateral can have a direct effect on a guarantor, insofar as it may increase the deficiency payable under the guaranty. An allegation of bad faith in that context does not depend on anything in the relationship between lender and borrower, or on any defenses that might be available to the borrower. In that respect, it is distinct from the defenses expressly waived by the waiver of defense provision that Cambridgeport Savings, supra, held enforceable. The theory of bad faith advanced by defendants in this case does not involve the disposition of any collateral. Defendants’ contention, rather, is that the lender acted in bad faith in refusing to return funds erroneously transferred to it, causing the borrower to be unable to meet its obligations, thereby forcing it into default. This claim, at its essence, is an effort by the guarantors to assert a defense that by its nature would belong to the borrower — exactly the type of defense that the guaranty by its terms waives.[6] Neither Pemstein nor any other authority cited recognizes a broad-based bad faith exception to the general rule of Massachusetts law holding such waiver lan *505 guage enforceable. The Court concludes that the defendants’ theoiy of bad faith does not affect enforcement of the guaranty. It follows that factual disputes related to that theoiy are immaterial to BayNorth’s claim, and do not preclude summaiy judgment.[7]
2.Wickline’s Defense of Waiver.
Wickline claims that Flint’s statements, which Wickline understood as indicating that BayNorth would not enforce the Guaranty against him, constituted an oral modification of the guaranty. Massachusetts law permits oral modification, even in the face of a provision requiring writing. Cambridgeport Savings Bank, 413 Mass, at 439. Proof of such modification, however, “must be of sufficient force to overcome the presumption that the integrated and complete agreement, which requires written consent to modification, expresses the intent of the parties.” Id., n. 10. The proof Wickline offers here consists of his affidavit, in which he asserts his own understanding that a waiver of the guaranty as to him was “implicit” in statements made by Flint to the effect that BayNorth was not required to pursue all guarantors; that it would treat Wickline differently from Shoaf; and that it viewed Shoaf as the “bad actor” and would enforce the guaranty against him. Wickline’s affidavit does not say that Flint, or anyone else on behalf of BayNorth, ever actually promised not to enforce the guaranty against Wickline. The Court concludes that the evidence offered, taken as true, is insufficient to establish an oral modification.[8]
3.Public Policy.
Both defendants argue that enforcement of the guaranty would violate public policy, in that the provision making bankruptcy a full recourse encourages them to refrain from causing the borrower to file for bankruptcy even when their fiduciary duties to creditors and other investors might require them to do so. None of the cases they cite for this theoiy involves a loan guaranty, nor does any of them present facts remotely relevant to those presented here. Geller v. Allied-Lyons PLC, 42 Mass.App.Ct. 120, 122-23 (1997), is illustrative. There the plaintiff, a corporate fiduciary, sought to enforce a contract under which he would receive a finder’s fee for assisting another corporation in acquiring his company. The Court held the contract unenforceable, because it would reward the plaintiff for breaching his fiduciary duty to his employer. Id.
Enforcement of the guaranty in issue here would have no such effect. If public policy is implicated here at all, in the Court’s view it favors enforcement of the guaranty, since a contrary result would undermine the commercial value of loan guaranties in general, with a resulting negative effect on availability of credit. The Court perceives no public policy that prohibits enforcement of the guaranty.
4.The Yield Maintenance Amount.
Defendants assert a series of theories to avoid the yield maintenance amount. Wickline first asserts that the yield maintenance amount is due only “if the entire principal balance ... is prepaid.” This argument ignores the plain language of section 4.2 of the note, which provides for payment of the yield maintenance amount if “payment of this Note is required pursuant to any provision of the Loan Documents prior to the originally scheduled maturity date . . . including, without limitation, on account of any default.”
Wickline next argues that BayNorth’s calculation of the amount is incorrect, in that the 30% rate should not take effect until the default, and the $5.6 million payment should be subtracted before calculation of interest. Here again, the language of the note dictates the contrary. Section 4.2 defines the yield maintenance amount as the:
sum of (i) the amount . . . sufficient to provide [BayNorth] with a monthly compounded, rate of return of thirty percent (30%) per annum on [BayNorth’s] investment in this Note through the date of prepayment of this Note, and (ii) the further amount . . . required to allow [BayNorth] ... to receive on the originally scheduled maturity date of this Note the amount of the principal of this Note outstanding immediately prior to such prepayment, and monthly payment of interest on the principal of this Note through the originally scheduled maturity date of this Note calculated at the rate of thirty percent (30%) per annum compounded monthly.
The effect of this language is that, in the event that prepayment is required as a result of default, BayN-orth is entitled to receive the principal amount loaned, plus interest on that full amount, at 30%, compounded monthly, for the full original term of the loan. This is what the parties negotiated and agreed.
Finally, Wickline argues that the yield maintenance amount is an unenforceable penalty. Massachusetts courts will enforce a liquidated damages provision according to its terms “[w]here actual damages are difficult to ascertain and where the sum agreed upon by the parties at the time of the execution of the contract represents a reasonable estimate of the actual damages.” Kelly v. Marx, 428 Mass. 877, 880 (1999), quoting A-Z Servicenter, Inc. v. Segall, 334 Mass. 672, 675 (1956). See NPS, LLC v. Minihane, 451 Mass. 117, 420 (2008). The same standard applies to enforcement of a contractual premium for prepayment of a loan. See Clean Harbors, Inc. v. John Hancock Life Ins. Co., 64 Mass.App.Ct. 347, 355 (2005).
Here, the parties to the note expressly agreed that the yield maintenance amount would be payable “not as a penalty but on account of the loss of the Lender’s opportunity to receive the payments of Base Interest and Contingent Interest which otherwise would have been payable through and including the originally scheduled maturity date of this Note.” They further agreed that “it is veiy difficult to estimate the damages which would be suffered by the Lender if this Note is prepaid prior to the originally scheduled maturity date of this Note, and that the Yield Maintenance Amount is a reasonable estimate *506 of the Lender’s anticipated actual damages.” Saying it does not make it so, but the express terms of the contract, executed by sophisticated parties represented by counsel, do indicate the view the defendants were willing to adopt when they were seeking financing.
The present record provides little basis for the Court to make an independent evaluation of reasonableness. The note provides for base interest, compounded monthly, at an annual rate of 16 percent, plus certain amounts to be paid as contingent interest, according to complex formulas set forth. Neither side has submitted anything to elucidate application of those formulas, so as to provide any basis to estimate the total amount BayNorth would have received absent default. What the Court can discern is that the transaction provided Bay-North an opportunity to earn a high yield, in return for high risk. In arguing that the yield payment amount is excessive, Wickline merely points to the large amount BayNorth seeks, and asserts that it is “clearly excessive on its face and is not a reasonable estimate of actual damages at the time of contracting.” He offers nothing to support that assertion, which directly contradicts his acknowledgment in the guaranty. As. Wickline points out, reasonableness is usually a question of fact for the fact finder. In the absence of any evidence from which a fact finder could find the amount excessive, however, no genuine dispute appears.[9]
Shoaf invokes the Massachusetts usuiy statute, G.L.c. 271, §49, which prohibits loans with interest and charges exceeding twenty percent in the absence of notice to the attorney general in compliance with §49(d). Under that subsection, the statutory prohibition does not apply to a lender who “notifies the attorney general of his intent to engage in” an otherwise prohibited transaction. “Such notification shall be valid for a two year period,” and must contain specified information; the lender must also keep specified records with respect to each loan. Records of the attorney general, submitted by Shoaf with authenticating affidavits, reveal that BayNorth did notify the attorney general, in a series of letters, the most recent of which is dated July 31, 2006. That notification, Shoaf contends, expired two years later, on July 31,2008, so that BayNorth cannot now lawfully collect interest exceeding the statutoiy limit BayNorth responds that it met the statutoiy requirement by giving notice within two years before the loan transaction; it had no obligation to give further notice regarding the same loan.
Neither side has cited any case law or other authority, aside from the statute itself, addressing the question of whether a lender who has notified the attorney general before making a loan must give further notice thereafter. The language of the statute — which must be read narrowly, in light of its criminal penalties — provides no indication of any such requirement. Section 49(d) requires the lender to give notice of its “intent” to engage in an otherwise prohibited transaction. That language leaves no doubt that prospective notice is required; the lender must give notice before making the loan. See Clean Harbors, Inc. v. John Hancock Life Ins. Co., 64 Mass.App.Ct. at 365 (“notice should be on file with the Attorney General by the time the loan proceeds are disbursed”); Hakim Enterprises, Inc. v. Reinhardt, 30 Mass.App.Ct. 911, 911 (1991); Levites v. Chapman, 30 Mass.App.Ct. 356, 361-62 (1991). The two-year term of the notice permits the lender to make such loans for a two-year period after having given notice of the intent to do so. A subsequent notice regarding a loan already made could not express the intent to engage in a lending transaction; it could only confirm that the lender has done what it previously indicated it intended to do. The Court concludes that the statute does not require such notice. Since BayNorth provided the notice required, the usuiy statute does not prevent enforcement of the yield maintenance amount.
CONCLUSION AND ORDER
For the reasons stated, BayNorth Realty Fund VI, L.P.’s Motion for Partial Summary Judgment is ALLOWED. Judgment shall enter for the plaintiff on count I of its complaint.

 Where the record indicates the existence of a dispute, the Court adopts the version most favorable to the defendants as the non-moving parties.

 The arrangement between Wickline and Shoaf, according to Wickline’s affidavit, was that Wickline was primarily responsible for negotiating financing for the project, and Shoaf was primarily responsible for construction, development, and operational management.

 Section 3.4(b) of the note provided that BayNorth would periodically apply certain receipts from sales of units to loan interest and principal.

 An adversary proceeding is pending in the Bankruptcy Court on behalf of the estate of the Easy Street entities asserting various tort and contract claims against BayNorth based on its refusal to return the funds transferred to it, and the harm alleged to have flowed to the debtors from that refusal. The Bankruptcy Court has denied BayNorth’s motion to dismiss that action. The Bankruptcy Court has also denied a motion to order a stay of this action.

 Judge Neel reached the same conclusion in RFC Special Assets I., Inc. v. Gifford, 11 Mass. L. Rptr. 138 *2 (Mass.Sup.Ct. 1999), citing Pemstein for the existence of a defense of bad faith in the disposition of collateral, but finding insufficient evidence to support it in the record presented.

 See generally, Cadle Co. v. Webb, 66 Mass.App.Ct. 269, 273 (2006), regarding the separateness of a contractual guaranty from the underlying note.

 For that reason, the Court will deny defendants’ requests to postpone consideration of the summary judgment motion pending discovery. For the same reason, the pendency of the adversary proceeding in the Bankruptcy Court, which presents the borrower’s claim of bad faith by BayNorth, does not warrant a stay of this action.

 The Court therefore does not reach the question of consideration, but notes that there is room for considerable doubt as to whether Wickline’s conduct in keeping BayNorth informed regarding the borrower’s circumstances would constitute consideration, in light of the borrower’s contractual obligations and Wickline’s position as a co-manager of the borrower.

 Wickline has not identified any evidence he would hope to elicit in discovery that would bear on this issue.