United States Court of Appeals,

Fifth Circuit.

No. 91-1466.

LAKE FOREST DEVELOPMENTS, Plaintiff-Appellant,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, As Receiver for Gibraltar Savings Association, et al., Defendants,

First Gibraltar Bank, FSB, Defendant-Appellee.

April 28, 1993.

Appeal from the United States District Court for the Northern District of Texas.

Before GARWOOD and EMILIO M. GARZA, Circuit Judges.[*]

GARWOOD, Circuit Judge:

Plntiff-appellant Lake Forest Developments (Lake Forest) filed this suit against Gibraltar Savings Association (GSA) in Texas state court in 1981 alleging that GSA had breached a loan agreement by failing to fully fund Lake Forest's development of 74 acres of real property. Lake Forest subsequently defaulted on the loan, and added claims of wrongful foreclosure after GSA nonjudicially foreclosed upon and purchased the property at a trustee's sale. Thereafter, the case was removed to the district court below. Lake Forest brings this appeal from the district court's grant of summary judgment in favor of First Gibraltar Bank, FSB (First Gibraltar), which came into possession of the property through an acquisition agreement with the FSLIC upon GSA's insolvency. We affirm.

**Facts and Proceedings Below**

On March 30, 1977, GSA entered into a loan agreement with Johnson-Loggins, Inc., to finance development of 74 acres of real property in Denton County, Texas for residential use. The loan agreement set forth Johnson-Loggins's obligations to submit a master development plan for GSA's approval, to be followed by more specific section plans and budgets for the parts of the

_____

[*]Judge John R. Brown was on the panel that heard oral argument in this case, but passed away before the decision was entered, and the case is accordingly decided by a quorum. *See* 28 U.S.C. § 46(d).

property that were to be platted, showing detailed plans for streets, utility lines, etc. Section 2.02(a) of the agreement provided in part:

> "[GSA] shall be obligated to furnish to [Johnson-Loggins] the amount of funds required to discharge and pay the costs of acquisitions and holding of the said property, to pay taxes, insurance and other specific direct costs of the development as set out in Section 3.04 hereinafter.... Gibraltar shall not be obligated to advance in excess of eighty percent (80%) of the appraised value of the subject property according to the appraisal submitted to and accepted by [GSA]. [GSA] shall not accept a reappraisal at a later date in order to increase the amount of funds to be advanced hereunder."

The direct costs listed in Section 3.04 included, *inter alia,* the cost of land, cost of improvements, property taxes, advertising and sales expenses, and recording and title fees. Section 5.01 provided that the debt was to be nonrecourse, with GSA looking for repayment solely to the property and other security provided. On the same day, Johnson-Loggins executed a $1.8 million promissory note to GSA reflecting advances that it was contemplated GSA would thereafter periodically make for expenses in developing the property. The note also reflected that the debt was nonrecourse, with GSA agreeing to look solely to the mortgage described in a deed of trust executed contemporaneously by Johnson-Loggins for repayment.

Several months later, this loan agreement was assigned to Lake Forest, a joint venture formed by John W. McMackin (McMackin) and Robert West (West) to develop and ultimately sell the property. In October 1977 McMackin, on behalf of Lake Forest, submitted to GSA a plan and basic budget for the first phase of development of the property. The first phase included development of 22.2 acres. A November 7, 1977 GSA memorandum reflects GSA's assent to proceed based on the plan submitted by McMackin.

In January 1979, McMackin submitted to GSA a plan and budget for the second phase of development. This plan included a request for additional funds based on a reappraisal of part of the property. A GSA memorandum dated January 11, 1979 discussing this proposal shows that the property is divided into three parcels, and that Parcel 1, on which it was originally contemplated that there would be 62 lots, had been reconfigured so that it would contain 106 lots. As a consequence of this changed land plan, a new appraisal of Parcel 1 had been performed, resulting in a new total appraised value for all three tracts of $3,015,591. The memorandum reflects that the "Loan Request

at 80%" based on the new appraisal was $2,412,470, representing a request for new funds in the amount of $610,870. The plan, budget, and request were all approved by GSA.

On May 29, 1979, Lake Forest executed a promissory note to GSA in the amount of $2.96 million, renewing and extending the original $1.8 million loan. Like the previous note, this note reflected that it evidenced a nonrecourse debt and was accompanied by a deed of trust on the property.

In late 1980, Lake Forest sought further development funding that would have increased the total loan amount to approximately $3.3 million. A November 14, 1980 GSA memorandum summarizing the request shows the requested amount to be eighty percent of the property value as calculated in an October 1980 appraisal. This memorandum, from GSA Vice-President Charles Ackerman (Ackerman), recommended that GSA grant the loan as requested. A memorandum dated February 9, 1981 reflects that Ackerman had met with McMackin and was making the following recommendations (among others) for changes in the loan agreement when it was extended: (1) that McMackin would be 100 percent liable for the loan balance, and (2) that GSA would have no further obligation to make future loans. According to a GSA memo dated February 10, 1981, the GSA loan committee approved the refinancing on the conditions suggested by Ackerman, including personal liability by McMackin. McMackin submitted to the district court documents that he claims GSA demanded that he sign in order to receive the requested additional funding for Lake Forest. These documents included a full personal guaranty of the new loan and a termination of the March 1977 loan agreement.

McMackin refused to sign these documents. On August 11, 1981, Lake Forest filed suit in Texas state court against GSA for breach of contract, seeking specific performance or damages. Lake Forest subsequently defaulted in its payments on the May 1979 note, and GSA foreclosed and purchased the property at a trustee's sale on June 7, 1983. GSA also foreclosed upon and subsequently purchased, at two judicial sales, a total of twenty-seven promissory notes that Lake Forest had collaterally assigned to GSA as additional security. Lake Forest then amended its complaint to add claims for wrongful foreclosure.

On December 27, 1988, the Federal Home Loan Bank Board declared GSA insolvent and appointed the FSLIC as receiver. The following day, the FSLIC entered into an agreement with what was then First Texas Bank. First State Bank acquired certain GSA assets, including the property formerly owned by Lake Forest, and took the name First Gibraltar.

In January 1989, the FSLIC intervened in Lake Forest's suit and removed it to federal court. On July 27, 1989, the district court granted Lake Forest's motion for leave to join First Gibraltar as a party necessary for adjudication of rights to the property. Lake Forest's fourth amended petition, its final pleading, included the following allegations: (1) that no appraisals were submitted for the $1.8 million note, and that appraisals submitted in November 1978 and March 1979 resulted in the increase of the note to $2.96 million in May 1979; (2) that Ackerman and GSA Executive Vice-President Wiley Wisely represented to McMackin that GSA would not refuse to advance development funds based on reappraisals if Lake Forest was developing the property according to the loan agreement; (3) that McMackin relied on these representations in continuing to develop the property in phases and submit new loan requests for the different phases; (4) that GSA "has failed and refused and continues to fail and refuse to advance adequate development funds based upon acceptable reappraisals, or on any basis, for the development of the property in accordance with the March 30, 1977, Loan Agreement"; (5) that GSA "has waived and is estopped from relying on the provision of the March 30, 1977, Loan Agreement that it was not obligated to accept reappraisals based upon the words and actions of its agents who had actual or apparent authority to bind" GSA. The complaint requested that the trustee's sale of June 7, 1983, be declared void because GSA had no justifiable cause for initiating foreclosure proceedings, and because any default by Lake Forest was directly attributable to GSA's breach of the loan agreement. In addition, the petition asked the court to set aside the June 2, 1983, public sale of twenty-one of the promissory notes assigned to GSA as collateral because the notice of the sale was inadequate, and because Lake Forest's default was caused by GSA's prior breach of the loan agreement. Lake Forest further asserted a cause of action for breach of the covenant of good faith and fair dealing implied under the common law and under Tex.Bus. & Com.Code § 1.203 (Vernon 1968).

On March 26, 1991, after substitution of the FDIC for the FSLIC as receiver for GSA, the district court entered an order granting the FDIC's and First Gibraltar's respective motions for summary judgment. Lake Forest brings this appeal as to First Gibraltar only.

## Discussion

This Court reviews a district court's grant of summary judgment *de novo,* taking the evidence and inferences to be drawn therefrom in the light most favorable to the nonmoving party, and determining whether the pleadings, depositions, answers to interrogatories, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Crenshaw v. General Dynamics Corp.,* 940 F.2d 125, 127 (5th Cir.1991) (per curiam); Fed.R.Civ.P. 56(c). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Here, the burden of proof was on Lake Forest, as plaintiff.

The primary argument offered by First Gibraltar in support of the summary judgment is that Lake Forest's complaint is barred by the *D'Oench, Duhme* doctrine. The *D'Oench, Duhme* doctrine was founded on the principle that when, for the accommodation of a bank, a person executes a facially binding and unqualified obligation, he should not thereafter be permitted to escape the FDIC's enforcement of that obligation by asserting that he agreed with the bank that it would not be enforced according to its terms. *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.,* 315 U.S. 447, 458-60, 62 S.Ct. 676, 680, 86 L.Ed. 956 (1942). The doctrine has been applied to shield the FDIC and its assignees against unrecorded side agreements that tend to deceive creditors and the public banking authorities. *Federal Deposit Insurance Corp. v. Hamilton,* 939 F.2d 1225, 1228 (5th Cir.1991); *Federal Savings & Loan Insurance Corp. v. Griffin,* 935 F.2d 691, 697 (5th Cir.1991), *cert. denied,* --- U.S. ----, 112 S.Ct. 1163, 117 L.Ed.2d 410 (1992); *Porras v. Petroplex Savings Association,* 903 F.2d 379, 380-81 (5th Cir.1990).

We must agree that the *D'Oench, Duhme* doctrine is fatal to Lake Forest's claim that GSA breached the March 1977 loan agreement. As the complaint itself demonstrates, Lake Forest relies

upon an alleged oral waiver by GSA of the provision of the loan agreement stating that GSA was not obligated to accept reappraisals for the purpose of increasing the loan commitment under the agreement. The essence of *D'Oench, Duhme,* however, is that such oral side agreements "do not appear on the judicial radar screen." *Bowen v. Federal Deposit Insurance Corp.,* 915 F.2d 1013, 1016 (5th Cir.1990). Judged according to the terms of the written agreement, GSA's complained of refusal to advance further funds to Lake Forest in 1981 based on a reappraisal of the property at that time (or, more precisely, its refusal to advance further funds without changing the terms of the loan agreement to require a personal guaranty) cannot be a breach of the agreement.[1] Since Lake Forest's claims of wrongful foreclosure rest upon this alleged breach, they fail under *D'Oench, Duhme.*[2]

Likewise, Lake Forest cannot, consistent with *D'Oench, Duhme,* seek to prove a breach of good faith or fiduciary duty by relying on these alleged representations that are contrary to the written loan agreement. *Cf. Langley v. Federal Deposit Insurance Corp.,* 484 U.S. 86, 108 S.Ct. 396, 400-01, 98 L.Ed.2d 340 (1987) (proof of alleged fraudulent misrepresentations not reflected in the loan documents was foreclosed by *D'Oench, Duhme*'s statutory counterpart, 12 U.S.C. § 1823(e)); *Texas Refrigeration Supply, Inc. v. Federal Deposit Insurance Corporation,* 953 F.2d 975, 982 n. 13, 983

---

[1]There is no claim (or evidence) of any written waiver or agreement to accept such a reappraisal. The only Loan Agreement of which there is any evidence is that of March 30, 1977.

[2]In some respects, this is not a classic *D'Oench, Duhme* case. Lake Forest is not trying to enforce an unrecorded side agreement against the FDIC or its assignee; rather, it is arguing that *GSA*'s breach of its own oral promise rendered its foreclosure under the deed of trust wrongful, and thus prevented GSA from passing clear title to the property to the FSLIC, and then to First Gibraltar. (Lake Forest filed a notice of *lis pendens* on the property with the Denton County Clerk on July 11, 1983.) When the FDIC comes into possession of an *instrument, D'Oench, Duhme,* in prohibiting an obligor from engrafting additional unwritten terms onto the agreement, fulfills the public policy of enabling the FDIC to rely on the bank records. *See Hamilton,* 939 F.2d at 1229-30. In the present case, by contrast, the FSLIC came into possession of a tangible piece of property that was the subject of ongoing litigation.

Though the case is thus somewhat removed, both logically and in terms of policy considerations, from the core concerns of *D'Oench, Duhme,* decisions of this Court applying the doctrine in similar circumstances convince us that it must extend to encompass the present case. *See, e.g., Texas Refrigeration Supply, Inc. v. Federal Deposit Insurance Corp.,* 953 F.2d 975, 982 n. 13, 983 & n. 15 (5th Cir.1992); *Buchanan v. Federal Savings and Loan Insurance Corp.,* 935 F.2d 83, 86 & n. 5 (5th Cir.), *cert. denied sub nom. Buchanan v. First Gibraltar Bank, FSB,* --- U.S. ----, 112 S.Ct. 639, 116 L.Ed.2d 657 (1991).

& n. 15 (5th Cir.1992).

The only claim by Lake Forest that does not rely on the alleged oral modification of the loan agreement, and thus is unaffected by *D'Oench, Duhme,* is the claim that GSA's notice of the foreclosure sale for the promissory notes was inadequate. The basis for this claim is that although Lake Forest received a notice stating that twenty-one of the twenty-seven promissory notes were to be sold in bulk at a public sale at 10:00 a.m. on June 2, 1983 at the door of the Denton County courthouse, the notice did not specify the maker, principal amount, interest rate, and maturity date of each. According to a May 27, 1983 letter from McMackin's attorney objecting to the notice, the lack of this information rendered the notice inadequate because the information would be required by a bidder in advance of the sale in order to compute a fair and reasonable value for the notes. The letter alleged that the absence of that information would detrimentally affect the price received for the notes. GSA did not correct any of the alleged deficiencies. It held the sale as scheduled, and was the only bidder.

In essence, Lake Forest does not challenge the notice it received of the sale, but rather raises a question whether, given this *public* notice, GSA's sale of the collateral was commercially reasonable. *See* Tex.Bus. & Com.Code § 9.504(c) (Vernon 1991) ("Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.").

The notice in question stated that the promissory notes "are in amounts which vary between $12,250.00 and $30,600.00 and are at fixed interest rates between 9% and 11%." Although a prospective purchaser would certainly require more detailed information before making an actual bid, this notice would have sufficed to alert persons who might be interested in buying the notes to the sale. Lake Forest does not allege that more detailed information would not have been available to a purchaser who made inquiries to GSA or who attended the sale. Without such allegations, Lake Forest has failed to raise a genuine issue of material fact regarding commercial reasonableness; in few, if any, sales could a buyer confidently make a bid based solely on a notice or advertisement.

**Conclusion**

We conclude, based on the summary judgment evidence presented by both sides, that Lake Forest failed to raise a genuine issue of material fact that could have entitled it to recovery. Accordingly, the summary judgment granted in favor of First Gibraltar is

AFFIRMED.