OPINION
MATTHEWS, Justice.
I. INTRODUCTION
Annette Beal purchased two adjoining parcels of property in 1991 for $95,000 and *1038 $135,000. The promissory notes on the two parcels were secured by a single deed of trust covering both parcels. In 1994 Annette paid off the $95,000 note. In 1999 Annette defaulted on the $26,780.81 debt remaining on the other note. The trustee under the deed of trust foreclosed on both parcels. Sarah Baskurt, Robert Wainscott, and Allen Rosenthal purchased the property at the foreclosure sale for $26,781.81, one dollar over the remaining debt on the property. The trial court set aside the sale on the grounds that it was void and voidable. We affirm.
II. FACTS AND PROCEEDINGS
A. Facts
This case involves two parcels of land originally owned by Marion and Mortimer Moore. In 1958 Mortimer was granted a homestead patent to a forty-acre parcel which he conveyed to his wife, Marion, in 1959. The following year, Marion acquired a second parcel to the north of the homestead property, Parcel 1. In 1974 the majority of the homestead property was sold, leaving Parcel 2, which adjoined Parcel 1 to the south. The two parcels were never replatted or otherwise legally merged into a single parcel.
The Moores divorced in 1976. In the divoree settlement, Mortimer received Parcel 1, and Marion received Parcel 2 and retained a life estate in Parcel 1. Marion formed a revocable trust that became the owner of her interests in both parcels with Marion as trustee of the trust.
In 1991 Mortimer and Marion simultaneously sold their respective parcels to Charles McAlpine. The following day, MecAl-pine conveyed the parcels to Annette Beal by quitclaim deed. These transactions were financed by two separate promissory notes signed by MceAlpine: Note A for $95,000 payable to Mortimer; and Note B for $135,000 payable to Marion. Each note was to be paid to the respective seller through its own separate escrow account.
The two promissory notes were secured by a single deed of trust covering both parcels containing the following special condition: "This deed of trust is covered by 2 Promissory Notes, and Trustor is aware that default on either of the 2 Note [sic], will constitute default under the other Note and foreclosure laws of the State of Alaska shall apply." The deed of trust also provided that "[uJpon default by Trustor in payment of any indebtedness secured hereby ... Trustee ... shall," at the option of the Beneficiary, "sell said property[,] ... either as a whole or in separate parcels and in such order as it may determine, at public auction to the highest and best bidder...."
In 1994 Annette paid off the $95,000 owed on Note A for Parcel 1 to Mortimer. At that time, there was some discussion regarding paying off Note B, but Marion preferred to continue to receive monthly payments rather than being paid off in a single lump sum. Marion did agree to a reduction of the interest rate on Note B. The 1991 deed of trust was modified to reflect the payoff of the note to Mortimer and the change in interest rate on Marion's note.
In the fall of 1999, after an erratic payment history, Annette fell behind in her payments. Sarah Baskurt,[1] the Moores daughter, took steps to commence foreclosure, including contacting attorney Jim Christie to conduct the foreclosure. Christie and Land Title Company of Alaska, Inc., made the arrangements for the foreclosure. At that time, Annette owed $26,780.81 on Parcel 2, having paid approximately eighty percent 'of the original $135,000 purchase price.
The foreclosure sale was held on April 26, 2000, inside the main entrance of the Nesbett Memorial Courthouse in Anchorage. Prior to arriving at the sale, Baskurt, who wanted to bid on the property but believed she lacked the financial strength and knowledge of property development to do so on her own, contacted friends to see if they would be interested in bidding on the property as her partner. Robert and Joyee Wainscott *1039 agreed and Baskurt and Joyce Wainscott formed a partnership for the purpose of acquiring and developing or reselling the property. Baskurt, who believed the property was worth at least $250,000, brought a check for $151,000 to the sale. The Wainseotts brought a check for $100,000 to the sale. The trio had at least $251,000 available to put toward the purchase price of the property.
At the sale Baskurt recognized her neighbor, Alien Rosenthal, whom Baskurt knew to have considerable experience in home construction. Rosenthal had learned of the foreclosure sale about a week earlier and had contacted Land Title, who referred him to Christie. Christie provided Rosenthal with general information about the property and the foreclosure. Rosenthal, who believed the property could be subdivided for family residences or condominiums, thought that if he could purchase the land for under $160,000 he would have gotten a "good deal." He had with him cashier's checks for $60,000 and $100,000.
Baskurt approached Rosenthal and asked why he was at the sale. Rosenthal testified that he told Baskurt he was interested in bidding on the property but denies that he told Baskurt how much he was willing to bid. Baskurt claims Rosenthal told her he would be willing to bid up to $95,000 on the property. Baskurt asked Rosenthal to join her partnership with Joyce, and Rosenthal tentatively agreed. Baskurt spoke with Joyce, and the three cemented their partnership. There was little discussion regarding bidding strategy or tactics, and the three assumed that each would be a one-third partner, contributing an equal portion to the sale price. Immediately following the expansion of the partnership, Leslie Plikat, Land Title's agent, inspected Baskurt's and Rosenthal's cashiers checks. Plikat registered two bidders, Baskurt and Rosenthal.
The foreclosure sale, conducted by Christie, was by public outery. Baskurt made the opening and only bid for $26,781.81, a dollar over the remaining debt owed on the property, on behalf of the partnership. There were no other bids, and the property was sold to Baskurt, Joyce, and Rosenthal via a trustee's deed.
B. Proceedings
On May 17, 2000, Annette filed a complaint against Baskurt, Wainscott, | Rosenthal, MeAlpine, and Land Title seeking to have the foreclosure sale set aside.[2] Baskurt, Wainscott, and Rosenthal (collectively "Purchasers") subsequently moved for summary judgment, arguing there was no basis for setting aside the sale. Purchasers motion for summary judgment was denied because a question of fact remained whether "the parties intended for both parcels to be subject to foreclosure upon default of one note when the other note had been satisfied." After a three-day bench trial, the superior court set aside the foreclosure sale as both void and voidable. Final judgment setting aside the foreclosure sale and awarding attorney's fees and costs to Annette was entered on February 28, 2008.[3] Purchasers appeal.
III. DISCUSSION
A. Standard of Review
Purchasers do not appeal the trial court's extensive findings of fact; rather they adopt the trial court's findings as their statement of the ease on appeal. Therefore whether the sale was void or voidable are questions of law requiring us to apply legal principles to undisputed facts. We apply our independent judgment to such questions of law.[4] We adopt "the rule of law that is most persuasive in light of precedent, reason, and policy." [5]
*1040 B. The Foreclosure Sale Was Voidable
Pursuant to AS 34.20.070 a trustee under a deed of trust executed as security for the payment of an indebtedness may, in the case of default or noncompliance with the terms of the deed, foreclose and sell the property according to the terms provided in the deed.[6] However, defects in the mechanics of the trustee's exercise of the power to foreclose may render the foreclosure sale voidable.[7] Generally, mere inadequacy of price is not sufficient by itself to require setting aside a foreclosure sale.[8] However, if the inadequacy of the sale price is (1) "so gross as to shock the conscience and raise a presumption of fraud or unfairness," or (2) is coupled with other irregularities in the sale procedures, then invalidation of the sale may be justified.[9]
Gross inadequacy is measured by reference to the fair market value of the property at the time of the sale.[10] Fair market value for these purposes has been defined as
not the fair "forced sale" value of the real estate, but the price which would result from negotiation and mutual agreement, after ample time to find a purchaser, between a vendor who is willing, but not compelled to sell, and a purchaser who is willing to buy, but not compelled to take a particular piece of real estate.[11]
Courts determine adequacy of price by comparing the fair market value to the purchase price of the property at the foreclosure sale. Jurisdictions vary on what percentage of fair market value renders the purchase price grossly inadequate. Foreclosure sale prices of fifty percent or more of fair market value are routinely upheld.[12] Even prices garnering less than fifty percent of fair market value are often upheld.[13] *1041 However, several courts have upheld the invalidation of a foreclosure sale that produced a price of twenty percent of fair market value or less.[14] The New Mexico Supreme Court has enunciated the standard that when the price falls into the ten to forty percent range, it should not be confirmed "absent good reasons why it should be.[15]
The Restatement adopts the position that although " 'gross inadequacy' cannot be defined in terms of a specific percentage of fair market value," generally, "a court is warranted in invalidating a sale where the price is less than twenty percent of fair market value and, absent other foreclosure defects, is usually not warranted in invalidating a sale that yields in excess of that amount.[16]
Even where the foreclosure sale price is not grossly inadequate, a low price coupled with some other irregularity in the foreclosure proceeding can be sufficient to render the sale voidable. As explained by the United States Supreme Court in Schroeder v. Young[17] and noted by this court in McHugh:
While mere inadequacy of price has rarely been held sufficient in itself to justify setting aside a judicial sale of property, courts are not slow to seize upon other cireum-stances impeaching the fairness of the transaction, as a cause for vacating it, especially if the inadequacy be so gross as to shock the conscience. If the sale has been attended by any irregularity, as if several lots bave been sold in bulk where they should have been sold separately, or sold in such manner that their full value could not be realized; if bidders have been kept away; if any undue advantage has been taken to the prejudice of the owner of the property, or he has been lulled into a false security; or, if the sale had been collusively, or in any other manner, conducted for the benefit of the purchaser, and the property has been sold at a greatly inadequate price, the sale may be set aside, and the owner may be permitted to redeem.[18]
Other commentators agree. Professor Nelson explains that problems connected with foreclosure sales, including
problems associated with the notice of the sale, sale by parcel or in bulk, and adequacy of the foreclosure price ... have their greatest impact in a cumulative sense. While one of these problems may not always be sufficient to set aside a sale, the more of them that are present in one fact situation, the greater the likelihood that a new sale will be ordered.[19]
The Restatement adopts a sliding-scale approach to the cumulative effect that price and irregular procedures have on the fairness of the sale:
Even where the foreclosure price for less than fair market value cannot be characterized as "grossly inadequate," if the foreclosure proceeding is defective under local law in some other respect, a court is warranted in invalidating the sale and may even be required to do so. Such defects may include, for example, ... selling too much or too little of the mortgaged real estate. For example, even a slight irregularity in the foreclosure process coupled with a sale price that is substantially below fair market value may justify or even compel the invalidation of the sale.... On the *1042 other hand, even a sale for slightly below fair market value may be enough to require invalidation of the sale where there is a major defect in the foreclosure pro-cegs.[20]
In McHugh, we considered the effect of selling property in bulk as opposed to by parcel.[21] Though we declined to adopt "a flat rule requiring the trustee to sell real property in separate lots or parcels, rather than as a whole unit,[22] we recognized that a trustee under a deed of trust is a dual fiduciary owing duties to both the trustor and the beneficiary.[23] Among the duties owed by the trustee is the duty to take reasonable and appropriate steps to avoid sacrifice of the debtor's property and interest.[24]
Bearing these principles in mind, we turn to the facts of this case. Purchasers contend that there was no basis to set the foreclosure sale aside as voidable. They argue, among other things, that the sale should not have been set aside on the basis of an inadequate price since under McHugh, an inadequate price is an insufficient basis for setting aside a foreclosure sale. Further, they contend that the sale should not have been set aside on the ground that the parcels were sold together because under McHugh, the trustee was under no duty to sell the parcels separately.
We are not convinced by Purchasers' argument. The test for whether a sale is voidable based on price inadequacy is whether the price paid was grossly inadequate when compared to the fair market value of the property on the date of the foreclosure sale. The trial court found that the 1991 sales price of $225,000 was the best indicator of fair market value. The fact that the foreclosure purchase price of $26,781.10 was less than fifteen percent of the sale price indicates that the gross inadequacy standard was met.[25] The trial court so found, and Purchasers identify no circumstances indicating that this finding is erroneous.
The superior court also found that the sale of either parcel alone would likely have generated sufficient proceeds to satisfy the amount due. By conducting the sale in bulk rather than selling only one parcel, the court found that the trustee failed in its duty to act reasonably to protect Beal's interests. This finding is supported by the evidence and is in accordance with our observation in McHugh that a trustee has a duty to take reasonable steps to act impartially and in such a way as "not to sacrifice the debtor's property.[26] When coupled with the inadequacy of the price, the trustee's unreasonable failure to sell only one parcel initially justifies invalidating the sale.[27]
We conclude that the superior court properly set aside the sale based on the grossly inadequate sale price and the trustee's failure to sell only one parcel in breach of its duty to act reasonably to protect Beal's interests.
IV. CONCLUSION
For the above reasons we conclude that the sale was voidable and AFFIRM the decision of the superior court.
CARPENETI, Justice, not participating.

. Baskurt had become the trustee of the Marion E. Moore Revocable Trust in 1998 after Marion died.

. McAlpine and Land Title filed disclaimers of interest in the property and are not parties to this appeal.

. Prior to trial, David Beal, Annette's husband, with whom she was going through a divorce, was conditionally allowed to intervene so long as the trial was not continued and no new issues were raised.

. Guttchen v. Gabriel, 49 P.3d 223, 225 (Alaska 2002).

. Guin v. Ha, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

. AS 34.20.070(a) provides in pertinent part:
If a deed of trust is executed conveying real property located in the state to a trustee as security for the payment of an indebtedness and the deed provides that in case of default or noncompliance with the terms of the trust, the trustee may sell the property for condition broken, the trustee, in addition to the right of foreclosure and sale, may execute the trust by sale of the property, upon the conditions and in the manner set forth in the deed of trust, without first securing a decree of foreclosure and order of sale from the court, if the trustee has complied with the notice requirements of (b) of this section.

. See Rosenberg v. Smidt, 727 P.2d 778, 784 (Alaska 1986) (distinguishing void and voidable sales; in case of latter, alleged defect goes "not to the trustee's right to proceed with the foreclosure but only to the mechanics of exercising that power") (internal citations omitted).

. See McHugh v. Church, 583 P.2d 210, 213 (Alaska 1978) (holding mere inadequacy of price insufficient to set aside foreclosure sale in context of judicial sale); see also Grant S. Netson & Dare A. Wairrmax, Reat Estate Finance Law § 7.21, at 672 (4th ed. 2002) ("All jurisdictions adhere to the recognized rule that mere inadequacy of the foreclosure sale price will not invalidate a sale, absent fraud, unfairness or other irregularity.").

. McHugh, 583 P.2d at 213-14.

. Restatement 3p or Property (MortoacEs) § 8.3 cmt. b, at 584, 593 (1997).

11. Id. at 584; see also BFP v. Resolution Trust Corp., 511 U.S. 531, 537-38, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) ("'The market value of ... a piece of property is the price which it might be expected to bring if offered for sale in a fair market; not the price which might be obtained on a sale at public auction or a sale forced by the necessities of the owner, but such a price as would be fixed by negotiation and mutual agreement, after ample time to find a purchaser, as between a vendor who is willing (but not compelled) to sell and a purchaser who desires to buy but is not compelled to take the particular ... piece of property.") (citing Brack's Law Dictionary 971 (6th ed.1990)).

. See, eg., Fed. Deposit Ins. Corp. v. Villemaire, 849 F.Supp. 116 (D.Mass.1994); Kurtz v. Ripley County State Bank, 785 F.Supp. 116 (E.D.Mo.1992); Danbury Savings & Loan Ass'n v. Hovi, 20 Conn.App. 638, 569 A.2d 1143 (1990); Moody v. Glendale Fed. Bank, 643 So.2d 1149 (Fla.3d DCA 1994); Guerra v. Mutual Federal Savings & Loan Ass'n, 194 So.2d 15 (Fla. 1st DCA 1967); Long Island Sav. Bank v. Valiquette, 183 A.D.2d 877, 584 N.Y.S.2d 127 (N.Y.App.Div.1992); Glenville & 110 Corp. v. Tortora, 137 A.D.2d 654, 524 N.Y.S.2d 747 (N.Y.App.Div.1988); Zisser v. Nock Indus. Marine & Ship Repair, Inc., 129 A.D.2d 795, 514 N.Y.S.2d 786 (N.Y.App.Div.1987); S & T Bank v. Dalessio, 429 Pa.Super. 282, 632 A.2d 566 (1993); Cedrone v. Warwick Fed. Sav. & Loan Ass'n, 459 A.2d 944 (R.I.1983).

. See, eg., Moeller v. Lien, 25 Cal.App.4th 822, 30 Cal.Rptr.2d 777 (1994) (25% of fair market value); Shipp Corp., Inc. v. Charpilloz, 414 So.2d 1122 (Fla. 2d DCA 1982) (33% of fair market *1041 value); Hurlock Food Processors Inv. Assocs. v. Mercantile-Safe Deposit & Trust Co., 98 Md.App. 314, 633 A.2d 438 (Md.1993) (35% of fair market value); Frank Buttermark Plumbing & Heating Corp. v. Sagarese, 119 A.D.2d 540, 500 N.Y.S.2d 551 (N.Y.App.Div.1986) (30% of fair market value).

. See, eg., Ballentyne v. Smith, 205 U.S. 285, 27 S.Ct 527, 51 LEd. 803 (1907) (14% of fair market value); Crown Life Ins. Co. v. Candlewood, Ltd., 112 N.M. 633, 818 P.2d 411 (1991) (15% of fair market value); United Oklahoma Bank v. Moss, 793 P.2d 1359 (Okla.1990) (approximately 20% of fair market value); Rife v. Woolfolk, 169 W.Va. 660, 289 S.E.2d 220 (1982) (14% of fair market value).

. Armstrong v. Csurilla, 112 N.M. 579, 817 P.2d 1221, 1234-35 (1991).

. Restatement § 8.3 cmt. b, at 584.

. 161 U.S. 334, 337-38, 16 S.Ct. 512, 40 L.Ed. 721 (1896).

18. McHugh v. Church, 583 P.2d 210, 213 (Alaska 1978) (quoting Schroeder, 161 U.S. at 337-38, 16 S.Ct. 512).

19. Grant S. Nerson & Date A. Warman, Reat Estate Finance Law § 7.16, at 657 (4th ed.2002).

20. Restatement 3p or Property (MortoacEs) § 8.3, al 587.

. See McHugh, 583 P.2d at 213-18.

. Id. at 218.

. Id. at 214.

. Id. at 218.

. See discussion supra pp. 1044-1045.

. McHugh, 583 P.2d at 218.

. Id. Our conclusion should not be read as implying that the gross inadequacy of the sale price alone would not be a sufficient ground to set aside the sale. It is not necessary to reach that question in this case because of the additional flaw in the sale process.