# Clean Harbors, Inc. *vs.* John Hancock Life Insurance Company & others.[1]

No. 04-P-892.

Suffolk. March 10, 2005. - August 29, 2005.

Present: Lenk, Cypher, & Kafker, JJ.

*Loan. Usury. Contract,* Loan. *Debt. Notice. Practice, Civil,* Attorney's fees.

In a civil action in which the plaintiff borrower challenged the propriety of the "make whole amount" charged by the defendant lenders upon the plaintiff's early repayment of a loan, the judge properly granted summary judgment in favor of the defendants, where the parties' agreement provided that the make whole amount was due whether the prepayment was optional or required [353-356], and where the plaintiff's voluntary decision to purchase a third party company and its concomitant default and payment of the notes under the parties' agreement was a voluntary prepayment rather than a payment compelled by the defendants' acceleration of the note, and therefore, the make whole amount was a contractual premium rather than a prohibited penalty under a liquidated damages analysis [356-360]; moreover, the premium owed upon prepayment bore a rational relation to the lenders' anticipated losses [360-364]; however, the judge should have entered partial summary judgment in favor of the plaintiff on the claim that the defendants violated G. L. c. 271, § 49, the usury statute, by filing notices pursuant to that statute after having released loan proceeds to the plaintiff [364-366].

The judge in a civil action properly calculated attorney's fees, where the judge reasonably declined to accept and consider as proof of attorney's fees certain records that were not made available to opposing counsel for examination, and where the judge properly limited his consideration to only those factors on which evidence was presented. [366-368]

Civil actions commenced in the Superior Court Department on September 27, 2002, and October 1, 2002, respectively.

[1]John Hancock Variable Life Insurance Company; Signature 4 Limited; Signature 5 L.P.; Special Value Bond Fund, LLC; Arrow Investment Partners; Bill and Melinda Gates Foundation; Hare & Co., Blazerman & Co.; and CoastLedge and Co.

After consolidation, the case was heard by *Allan van Gestel*, J., on motions for summary judgment, and a motion for costs and attorney's fees was also heard by him.

*Thomas S. Fitzpatrick* for the plaintiff.

*Brian Davis* (*Karen Collari Troake* with him) for the defendants.

LENK, J. The plaintiff, Clean Harbors, Inc. (Clean Harbors), appeals from summary judgment entered in favor of the defendant lenders (collectively, "John Hancock") on Clean Harbors's claims that the "make whole amount" charged by the defendants upon Clean Harbors's early repayment of a loan was improper, and that certain of the defendants violated G. L. c. 271, § 49, the usury statute. The defendants cross-appeal from what they consider to be an insufficient attorney's fee award.[2]

We affirm the judge's rulings regarding the enforceability of the make whole amount provisions of the parties' loan agreement and the amount awarded to John Hancock for attorney's fees. We reverse summary judgment on Clean Harbors's usury claim and remand for further proceedings.

We summarize the undisputed facts, taken principally from the judge's March 15, 2004, "Memorandum and Orders on Cross-Motions for Summary Judgment and Related Matters," and supplemented somewhat, here and in our discussion of the issues on appeal, from the summary judgment record.

The parties' dispute originated with an April, 2001, loan transaction. Clean Harbors is a publicly-traded Massachusetts company in the business of providing environmental services for hazardous and industrial waste management. At the time of the summary judgment proceedings, Clean Harbors anticipated gross revenues in excess of $650 million for the year 2003. But its financial picture in the late 1990's was quite different, reflecting an industry-wide downturn caused by increasing competition and decreasing waste. Having suffered net losses each year between 1995 and 1999, Clean Harbors was faced with repaying $50 million in notes that were coming due in May, 2001.

---

[2]Hare & Co., Blazerman & Co., and CoastLedge and Co. did not participate in the cross appeal.

Needing to refinance that debt, Clean Harbors retained Deutsche Bank Securities, Inc. (Deutsche Bank), in October, 2000, to act as its financial advisor in structuring a new credit arrangement and as its exclusive placement agent in contacting and conducting negotiations with potential investors.

Deutsche Bank warned Clean Harbors that financing would likely be difficult to obtain, due to the tight capital markets and the turmoil in the waste management industry at the time. Clean Harbors decided to pursue private "mezzanine financing," as other financing alternatives were either unavailable or too expensive.[3] Deutsche Bank solicited mezzanine finance proposals on Clean Harbors's behalf. Only two potential investors emerged, John Hancock being one of them.

In January, 2001, Deutsche Bank forwarded both proposals to Clean Harbors. Clean Harbors preferred to go with John Hancock, but was concerned that the terms of John Hancock's proposal included a prohibition on redemption within the first three years of the loan. Clean Harbors wanted the flexibility to prepay the loan, and so instructed Deutsche Bank to seek a more favorable prepayment provision. John Hancock agreed to substitute a revised prepayment provision that permitted Clean Harbors to pay off the notes early, so long as Clean Harbors agreed to pay a "make whole amount" applicable to the first three years of the loan. The proposed make whole amount used a discount rate tied to the interest paid on United States Treasury securities at the time of prepayment plus 250 basis points.[4] At some point in February, 2001, Deutsche Bank utilized that formula to calculate the make whole amounts that might become

[3]Edwin Roland, a director of Deutsche Bank's high yield capital market group, defined mezzanine financing as "a subordinating debt generally with equity." Bruce McDonald, a vice president with Deutsche Bank's global corporate finance group, testified that mezzanine financing was, in general, "a term that's used for capital that is placed beneath senior debt and above the equity line. So, it's capital that is subordinated to senior debt, but senior to equity securities." John Hancock's expert, Peter K. Deeks, similarly explained, "The term 'mezzanine securities' is typically applied to subordinated debt with equity kickers due to their location on the balance sheet between senior debt and equity securities."

[4]As the judge explained, a " 'make whole' premium is a commonly used form of prepayment charge which is meant to compensate the lender for the loss of income on reinvestment of the prepaid amount."

due upon Clean Harbors's prepayment at various times during the first three years of the loan. These estimates ranged from $10.5 million to $14.35 million.

On April 12, 2001, the parties executed the Securities Purchase Agreement (SPA). The first sections of the SPA called for Clean Harbors to issue senior subordinated notes in the aggregate principal amount of $35 million, at sixteen percent interest, with fifty percent of the principal due in 2007, and the remainder due in 2008, and to issue warrants to the defendants for the purchase of 1,519,020 shares of Clean Harbors common stock. Most significant for our purposes were the following additional provisions:

> "4.1 Optional Prepayment of Notes at Any Time. The Company [Clean Harbors] may prepay the Notes, in full, or in part in integral multiples of $1,000,000 on any date. Prepayments of the principal of any Notes shall be made together with (a) interest accrued on the principal amount being prepaid to the Settlement Date and (b) the Make Whole Amount.

> ". . .

> "4.9 Make Whole Amount. The Company acknowledges that the Make Whole Amount due at any optional or required prepayment of the Notes (including any prepayment required pursuant to any provision of Section 4 or Section 7.2) has been negotiated with the Purchasers to provide a bargained for rate of return on the Purchasers' investment in the Notes and is not a penalty.

> ". . .

> "7.2 Acceleration in Event of Default. . . . (ii) By Action of Holders. If any Event of Default other than those specified in subsections (x), (xi), or (xii) of Section 7.1 shall exist, the Required Holders shall have the right to declare all the Notes then outstanding to be immediately due and payable in full at 100% of the outstanding principal amount thereof together with all interest accrued thereon and the Make Whole Amount, without any presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived."

Also included in the SPA's definitions at § 10 was the formula for determining the discount rate, which specified the formula of 2.5 percent (or 250 basis points) plus yield based on the applicable United States Treasury rate.

The loan proceeds were advanced on April 30, 2001. To accommodate Clean Harbors, the lenders wired the funds to Clean Harbors's bank before 11:00 A.M.[5] On the afternoon of April 30, 2001, Special Value Bond Fund, LLC, Arrow Investment Partners, and Bill and Melinda Gates Foundation filed their notification of the loans by hand with the Attorney General's office pursuant to G. L. c. 271, § 49(*d*). All the other lenders had filed their notices prior to April 30.

In the summer of 2001, Clean Harbors learned of an opportunity to purchase the Chemical Services Division (CSD) of Safety-Kleen Corporation, one of Clean Harbors's chief competitors, which had filed for bankruptcy protection a year earlier. Clean Harbors viewed the purchase as critical to its survival; the purchaser of CSD would likely dominate the national market, leaving the competition in its wake.

After months of negotiation, Clean Harbors announced its agreement to purchase CSD in February, 2002. The purchase price and the assumption of liabilities meant that Clean Harbors needed to finance $255 million in order to close. Clean Harbors obtained financing from a group of investors headed by Cerberus Capital Management L.P. John Hancock considered participating in the new financing, but ultimately declined.

The purchase of CSD posed a problem for Clean Harbors with respect to its existing loan with John Hancock. Under the terms of the SPA, Clean Harbors's purchase of CSD would place Clean Harbors in technical default.[6] Such default would permit John Hancock's acceleration of the notes and would

---

[5]The judge stated that 11:00 A.M. was the deadline for Clean Harbors's repayment of its existing indebtedness. In its brief, Clean Harbors claims the explanation was incorrect, that in fact "[t]he purpose of requesting that the Defendant-Lenders disburse their loan proceeds by 11:00 a.m. was so the funds would be received in time to then be wired out to the trustee holding the notes which were being paid off with the funds." In any event, the judge correctly observed that the morning transfer took place at Clean Harbors's request.

[6]By purchasing CSD, Clean Harbors would default on its "negative covenants" relating to the assumption of additional indebtedness, additional

implicate the make whole amount provisions of the SPA, which were expressly applicable to voluntary as well as required prepayment, that is, payment in full in response to acceleration, as detailed in §§ 4.9 and 7.2(ii), *supra.* In July, 2002, Clean Harbors sought and obtained John Hancock's permission to waive the thirty-day notice required prior to prepayment of the notes. On August 5, 2002, Clean Harbors requested that John Hancock consider a reduction in the make whole amount, at that time estimated at roughly $17 million, which would be owed under the SPA upon prepayment of the notes. At some point in mid-August, John Hancock notified Clean Harbors that it would not reduce the make whole amount.

In an internal memorandum dated August 12, 2002, an attorney for the law firm representing Clean Harbors opined that default and acceleration were more advantageous than voluntary prepayment of the John Hancock notes, in terms of Clean Harbors's ability to challenge the make whole amount. The memorandum specifically advised: *"In light of the Renda* v. *Gouchberg case [4 Mass. App. Ct. 786 (1976)], it is important to position the transaction as a 'default' by the Company and an acceleration by the Investors, rather than a voluntary prepayment by the Company"* (emphasis original). Subsequent electronic mail (e-mail) correspondence between Clean Harbors's attorneys and those representing the new lenders for the CSD acquisition, dated August 30, 2002, included the memorandum. In his deposition, a Clean Harbors attorney acknowledged that the legal memorandum was shared with the new lenders, but denied that Clean Harbors attempted to implement the strategy recommended therein.[7]

Instead, according to Clean Harbors, the new lenders "indicated that they would not fund the transaction unless the

liens, additional guarantees, entry into acquisitions, restrictive agreements, and default as to certain financial covenants. See §§ 6.1, 6.2, 6.3, 6.4, 6.8, and 6.10 of the SPA.

[7]It appears from the voluminous record before us that, in connection with the summary judgment proceedings, Clean Harbors filed a motion to strike a number of pieces of evidence, including the legal memorandum and the e-mail correspondence by which it was shared with the new lenders. The record does not indicate the basis for the motion. The judge denied all of Clean Harbors's motions to strike. As Clean Harbors does not discuss the issue in its brief on appeal, the issue is waived. See Mass.R.A.P. 16(a)(4), as amended,

situation with John Hancock was resolved," and that they would not "fund into a default." As of September 3, 2002, Clean Harbors's president and chief executive officer (CEO), Alan McKim, knew that Clean Harbors was going to be in default under the SPA and believed that John Hancock would call the notes for that reason.

On September 6, 2002, Clean Harbors executed the closing documents for the purchase of CSD. By letter, also dated September 6, 2002, Clean Harbors notified John Hancock that it (Clean Harbors) was in default under the SPA. See note 6, *supra*. On September 9, 2002, John Hancock notified Clean Harbors that it (John Hancock) was accelerating the notes, and thereupon demanded payment of the notes, accrued interest, and the make whole amount. The following day, Clean Harbors paid the notes and interest, and, under protest, the make whole amount of $16,991,129.44.

John Hancock filed a complaint in Superior Court on September 27, 2002, seeking a declaration that the SPA's make whole amount provisions were enforceable. Clean Harbors filed an amended complaint for declaratory judgment on October 22, 2002, which included a usury claim against three of the defendants, and the two actions were consolidated. John Hancock filed a motion for summary judgment on December 24, 2003; Clean Harbors responded with a motion for partial summary judgment. The Superior Court judge ruled in John Hancock's favor, concluding that Clean Harbors had prepaid the loan voluntarily and that the SPA's make whole amount did not constitute a penalty. The judge ruled against Clean Harbors on its usury claim, and awarded attorney's fees to John Hancock in the amount of $264,073.50, and costs in the amount of $59,272.82. Clean Harbors filed this appeal. John Hancock cross-appealed from the amount of attorney's fees and costs awarded to it by the judge.

1. *The make whole amount provisions.* (a) *Voluntary prepay-*

367 Mass. 921 (1975). The memorandum at issue and other related correspondence are in the record before us, and John Hancock has relied on the memorandum in its brief on appeal, without raising an objection from Clean Harbors. We therefore reference the contents of the memorandum here, but assume the truth of the Clean Harbors attorney's testimony that Clean Harbors did not attempt to implement the strategy.

*ment versus acceleration.* The principal issue on appeal is whether the judge correctly characterized Clean Harbors's payment of the notes on September 10, 2002, as a voluntary decision to prepay, or whether he should have treated the payment as required by virtue of John Hancock's acceleration. Clean Harbors, relying on *A-Z Servicenter, Inc.* v. *Segall,* 334 Mass. 672 (1956), takes the position that the payment was compelled pursuant to John Hancock's acceleration, and that the make whole amount constituted a prohibited penalty under a liquidated damages analysis. John Hancock maintains that Clean Harbors's prepayment was planned and voluntary, and that the make whole amount was merely a bargained-for, contractual premium, fully enforceable under principles of contract. See, e.g., *Renda* v. *Gouchberg,* 4 Mass. App. Ct. 786 (1976).

The distinction affects the approach we take to the make whole amount. It is well-established that a provision for liquidated damages owing upon a contract's breach will be enforced "[w]here actual damages are difficult to ascertain and where the sum agreed upon by the parties at the time of execution of the contract represents a reasonable estimate of the actual damages." *Kelly* v. *Marx,* 428 Mass. 877, 880 (1999), quoting from *A-Z Servicenter, Inc.* v. *Segall,* 334 Mass. at 675. "Liquidated damages will not be enforced if the sum is 'grossly disproportionate to a reasonable estimate of actual damages' made at the time of contract formation." *Kelly* v. *Marx, supra,* quoting from *Lynch* v. *Andrew,* 20 Mass. App. Ct. 623, 628 (1985).[8] Relying on this standard, Clean Harbors devotes significant effort on appeal to the issue of how best to estimate John Hancock's damages, if any, caused by prepayment of the notes.

Our approach is more hands-off when the borrower voluntarily prepays a loan, and, with it, a contractual premium to which the parties had agreed when they executed the contract. In *Renda* v. *Gouchberg, supra,* we held that in instances of voluntary

---

[8]We do not apply a "second-look" approach to the amount of the actual damages, as utilized in *A-Z Servicenter, Inc.* v. *Segall,* 334 Mass. at 675, and urged by Clean Harbors. In *Kelly* v. *Marx,* 428 Mass. at 878-881, the Supreme Judicial Court expressly rejected the second look approach in measuring the reasonableness of liquidated damages, and instructed that only the circumstances at the time of contract formation be considered.

election to prepay a loan, cases involving penalties payable as liquidated damages in response to a breach were not applicable, and we concerned ourselves only with whether the contractual premium, paid by the plaintiff borrowers upon voluntary prepayment of the loan, bore "a rational relation" to the defendant lenders' "actual damages on prepayment, merely securing to the defendants the 'benefit of [their] bargain' with the plaintiffs." 4 Mass. App. Ct. at 786, quoting from *Manganaro Drywall, Inc.* v. *Penn-Simon Constr. Co.,* 357 Mass. 653, 657 (1970). Significant in our reasoning in *Renda, supra,* was that, as a second mortgage holder, the lender was not required to permit prepayment, and so, upon early repayment, was entitled to the benefit of its bargain by enforcement of the prepayment provisions to which the parties had agreed at the outset. We considered whether the contractual premium bore a rational relation to the lender's damages only to ensure that the amount was not unconscionable. See, e.g., *Manganaro Drywall, Inc.* v. *Penn-Simon Constr. Co., supra* (interest charged under a settlement agreement "was not an unconscionable potential price to be paid by the defendant in return for the concessions made by the plaintiff").

As a result, where the prepayment is voluntary, we do not scrutinize the accompanying contractual premium to see how it measures up under the "reasonable estimate of actual damages" standard of a liquidated damages analysis. Instead, we take into account the fact that, in the event of a voluntary prepayment, the contractual premium merely secures to the lender the benefit of its bargain, reflecting the lender's concessions and the borrower's privilege to prepay the loan. Thus, we limit our analysis to whether the premium bears a rational relation to the lender's anticipated losses, in keeping with general principles of public policy.

We would also add that the "first look" approach of *Kelly* v. *Marx,* 428 Mass. at 880, though involving liquidated damages, should apply as well to the voluntary prepayment standard referenced in *Renda* v. *Gouchberg, supra,* but decided before *Kelly* v. *Marx.* See *Kelly* v. *Marx, supra* at 881 (contract will be enforced as written, where "[t]he parties agreed to the extent of their damages when they agreed on a liquidated damages

clause"). Whether repayment is voluntary or required, the relevant time for considering the lender's likely damages is the time of contracting, and not the time of breach or repayment. With that in mind, we address the parties' specific contentions.

i. *Was this a prepayment?* Clean Harbors begins with the argument that, by virtue of John Hancock's acceleration of the notes, there could be no voluntary prepayment, or any prepayment, for that matter. Clean Harbors relies for this principle on *Ferreira* v. *Yared*, 32 Mass. App. Ct. 328, 330 (1992), wherein we stated: "A prepayment premium does not attach when a loan is accelerated because the act of acceleration advances the maturity of the debt; the debt becomes immediately due and payable." But as the holding of *Ferreira* v. *Yared* makes clear, the situation is different when the terms of the note expressly provide that the prepayment premium will apply whether early repayment is voluntary or involuntary. As we went on to explain, *"unless the note otherwise provides*, a holder of a note cannot simultaneously accelerate the note and collect a prepayment penalty" (emphasis supplied). *Id.* at 331. We contrasted *Pacific Trust Co.* v. *Fidelity Fed. Sav. & Loan Assn.*, 184 Cal. App. 3d 817, 824 (1986), wherein it was held that the prepayment premium was due upon acceleration, pursuant to the note's prepayment provision, which explicitly stated that it applied "whether said prepayment is voluntary or involuntary, including any prepayment effected by the holder's exercise of the Acceleration Clause." But that is precisely the situation here.

The SPA provided that the make whole amount was due whether the prepayment was optional or required; the make whole amount provisions specifically included prepayment required pursuant to default and acceleration. See SPA §§ 4.9 and 7.2(ii). We accordingly reject Clean Harbors's contention that the default and acceleration that occurred in this case negated the make whole amount provisions. According to the plain language of the parties' agreement, the make whole amount was still owing, even after Clean Harbors defaulted and John Hancock accelerated the notes. Nothing in the cases cited by Clean Harbors undermines the agreement's express terms in that regard.

ii. *Was this a contractual premium or liquidated damages?*

Clean Harbors next argues that despite the SPA's plain language, the make whole amount provisions should not be enforced as written because to do so, in these circumstances and this amount, would work a penalty. Clean Harbors relies on *A-Z Servicenter* v. *Segall*, 334 Mass. at 675-676, for the proposition that when payment of a debt follows breach and acceleration, the contractual premium is viewed as a form of damages, and must therefore be limited to an amount approximating a reasonable estimate of those damages. See *id.* at 675 ("Whether a provision of a contract for the payment of a sum upon a breach is rendered unenforceable by reason of its being a penalty depends upon the circumstances of each case"). We turn, then, to the pivotal issue whether Clean Harbors's September 10, 2002, payment of the notes was compelled consequent to its breach, thereby triggering a liquidated damages analysis of the make whole amount, or whether it was a voluntary prepayment, and the make whole amount a contractual premium, merely securing to John Hancock the benefit of its bargain in permitting prepayment. On the undisputed facts, the judge determined that Clean Harbors's payment of the make whole amount was "a result of Clean Harbors' voluntary election to put itself in a position whereby it prepaid the Notes to facilitate the CSD acquisition." He therefore deemed the prepayment voluntary, and the make whole amount a "bargained for fee paid in exchange for the privilege of paying a debt early."[9]

Clean Harbors denies that its voluntary decision to purchase CSD was the equivalent of a voluntary decision to prepay the notes, as the judge concluded. Specifically, Clean Harbors asserts that the judge wrongly construed Clean Harbors's admission in its amended complaint that its lenders for the CSD acquisition "indicated that they would not fund the transaction unless the situation with John Hancock was resolved," as proof that Clean Harbors knew that its decision to acquire CSD required that the notes be prepaid. Clean Harbors insists the new lenders' requirement, that the existing debt "situation"

---

[9]On review of summary judgment, we, of course, consider the record and the legal principles involved without deference to the motion judge's reasoning. In this case, however, the judge's very thoughtful analysis is worthy of mention.

with John Hancock be "resolved," did not necessarily mean that the debt had to be paid off — perhaps John Hancock might choose not to accelerate the notes or might waive the default. On the basis of those possibilities, Clean Harbors urges that its decision to default under the SPA by purchasing CSD should not be deemed the equivalent of a voluntary prepayment. See *Goulart* v. *Canton Hous. Authy.*, 57 Mass. App. Ct. 440, 441 (2003), citing *Ng Bros. Constr., Inc.* v. *Cranney*, 436 Mass. 638, 643-644 (2002) (in summary judgment proceedings, "the evidence presented is always construed in favor of the party opposing the motion, and the opposing party is given the benefit of all reasonable inferences that can be drawn from it").

The record does not support the inference. First, in July, 2002, Clean Harbors sought John Hancock's permission to waive the thirty-day notice requirement for prepayment of the notes, to which John Hancock consented. Then, in early August, 2002, Clean Harbors asked John Hancock to reduce voluntarily the make whole amount that would become due upon prepayment. In mid-August, Kathleen E. McDonough, a director with John Hancock Financial Services Company, informed Alan McKim, Clean Harbors's president and CEO, that the lenders would not reduce the make whole amount that would be due if Clean Harbors prepaid the notes.

The fact that John Hancock, at an earlier time, considered an offer to participate with other investors in financing the CSD purchase does not support Clean Harbors's assertion that by the time of the actual CSD purchase, John Hancock might not necessarily call the notes and demand payment of the make whole amount upon Clean Harbors's default.

The undisputed evidence makes clear that, as the CSD closing drew near, Clean Harbors and its new lenders anticipated payment of the existing notes, not merely as one alternative to resolving the John Hancock debt, but as a foregone conclusion in proceeding with the financing of the CSD purchase. According to an answer to interrogatories by Stephen Moynihan, a Clean Harbors senior vice president of planning and development, Clean Harbors knew, as of early September, 2002, that John Hancock was "unwilling to provide any relief from the covenants under the Securities Purchase Agreement and that the

Defendants were insisting that Clean Harbors pay a prepayment penalty of approximately $17 million in connection with any payment of the $35 million principal amount of the Senior Subordinated Notes." The August 30, 2002, e-mail correspondence between attorneys for Clean Harbors and the new lenders, seven days before the CSD closing and Clean Harbors's notice of default to John Hancock, shared the recommendations of the August 12, 2002, memorandum prepared by Clean Harbors's counsel, emphasizing the legal advantage of postponing prepayment and triggering acceleration. According to the deposition testimony of Stephen Moynihan, however, the new lenders informed Clean Harbors prior to the CSD closing that they were unwilling to "fund into a default." Clean Harbors's president and CEO confirmed that, as of September 3, 2002, he believed the notes would be called because "we were going to be in default," and also confirmed that the new lenders "did not want to lend into a default." Once it had defaulted, Clean Harbors thereafter responded promptly to John Hancock's notice of acceleration with payment of the notes in full.

Viewing all the facts and reasonable inferences in Clean Harbors's favor, as the party opposing summary judgment, see *Lindsay* v. *Romano*, 427 Mass. 771, 771 (1998), the evidence nevertheless leads inescapably to the conclusion that Clean Harbors planned to pay off the existing debt to John Hancock in conjunction with its purchase of CSD and its new financing. In these circumstance, evidence that a notice of technical default was sent and a notice of acceleration followed does not change that result. See, e.g., *Ferreira* v. *Yared*, 32 Mass. App. Ct. at 331 ("It is not lost on us that a borrower may evade a lawfully agreed to prepayment penalty by embarking on a course of conduct which provokes acceleration of the note"). See also *In re LHD Realty Corp.*, 726 F.2d 327, 331 (7th Cir. 1984) ("Should such intentional defaults become a problem, however, we believe courts could deal with the difficulty by denying the acceleration exception in appropriate cases").

On this record, there is no other rational view of the undisputed facts regarding Clean Harbors's actions, and its argument that there were options other than acceleration in response to its default does not create a genuine issue for trial. See gener-

ally *Goulart* v. *Canton Hous. Authy.,* 57 Mass. App. Ct. at 441 (on a motion for summary judgment, "a judge may decide the issue as matter of law when no rational view of the evidence permits a finding" in the opposing party's favor). As such, the motion judge appropriately concluded, as matter of law, that Clean Harbors's voluntary decision to purchase CSD and the concomitant default and payment of the notes under the SPA should be treated as a voluntary prepayment, and not as a payment compelled by acceleration that would trigger a liquidated damages analysis. See, e.g., *Renda* v. *Gouchberg,* 4 Mass. App. Ct. at 786 (liquidated damages analysis did not apply to the borrower's voluntary election to prepay a loan).

(b) *Rational relation of the make whole amount to the lenders' loss.* We are similarly unpersuaded by Clean Harbors' argument that the make whole amount that became due upon prepayment of the loan was not rationally related to John Hancock's loss. In *Renda* v. *Gouchberg, supra,* we held that a voluntary prepayment provision in a note was not void as against public policy, because the amount owing bore "a rational relation" to the lender's anticipated damages and effectuated the lender's benefit of the bargain in permitting prepayment. In a subsequent decision, *Kelly* v. *Marx,* 428 Mass. at 880, involving liquidated damages, the Supreme Judicial Court held that the relevant time for considering the lender's damages is at the time of contracting, and not at the time of breach; as we discussed, *supra,* we will apply the "first-look" approach, as well, to whether the contractual premium owing upon prepayment bore a rational relation to John Hancock's anticipated loss.

Here, the record shows that at the time of contracting, the SPA's make whole amount provisions utilized a formula that bore a rational relation to the anticipated losses John Hancock would suffer as a result of prepayment of the loan.

The judge, in determining whether the make whole amount bore a rational relation to John Hancock's anticipated losses, correctly considered only the circumstances known to the parties at the date of contracting, and not what John Hancock's losses were at the time of prepayment. There is no dispute that as of April 12, 2001, the date the SPA was executed, a calculation of John Hancock's actual losses in the event of prepayment

was not possible. An expert for Clean Harbors, Donald Margotta, acknowledged that "[c]ertainly, at the time of contracting (April of 2001), there would be no way of knowing exactly what high yield corporate debt yields would be at the time of a future payment," opining, instead, that an estimate was possible based on certain market indicators.

The judge observed that the discount rate the parties had agreed to in the SPA was "consistent with the anticipated yield on new investments made by John Hancock's Bond Group overall during the preceding two years." Hence, the SPA's discount rate, at a minimum, bore a rational relation to anticipated returns on existing investments made by John Hancock's Bond Group, as of the date of contracting. But Clean Harbors argues that this formula was not consistent with John Hancock's anticipated losses upon prepayment because the formula was tied to investments in the overall bond market, and not to the high yield debt market. Clean Harbors maintains that because its debt consisted of "high yield, B rated, below investment grade notes," the make whole amount should have been based only on the anticipated yield John Hancock had derived during the preceding two years on similar "new B rated investments."

The parties appear to agree that the appropriate measure of premiums of this kind is the anticipated reinvestment the lender will be able to make with the funds upon the early prepayment of the debt. See *In re LHD Realty Corp.*, 726 F.2d at 330 (contractual prepayment premiums are intended to insure the lender against the loss of its bargain if interest rates decline at the time of prepayment and reinvestment).[10] It is undisputed that the parties could not have predicted with certainty, when they executed the SPA, what high yield investments and returns

---

[10]As described by Bruce McDonald, testifying on behalf of Deutsche Bank, Clean Harbors' agent and advisor in the SPA financing, "the purpose of the make-whole is to compensate, in this case an insurance company or any investor, for the reinvestment of the note or reinvestment of the funds that they have previously disbursed at a rate that will equate their future cash flows to the originally contemplated return for that particular security." As we explain, *infra*, because of Deutsche Bank's role as exclusive placement agent and financial advisor to Clean Harbors in connection with the SPA, we impute its knowledge regarding the transaction to Clean Harbors.

would be available to John Hancock, at the time of prepayment, for reinvestment of the prepaid funds.[11] And as the uncontroverted evidence makes clear, at the time of contracting, there was no guarantee that John Hancock would be able to reinvest the prepaid amounts in similar high yield mezzanine investments.[12]

Construing the evidence and all reasonable inferences in favor of Clean Harbors, as the nonmoving party, at best the record indicates only that other information and other methodologies were available that might have assisted the parties in more accurately calculating John Hancock's anticipated losses upon prepayment. But that evidence does not render the SPA's discount rate irrational, particularly given the acknowledged uncertainties surrounding the availability of high yield reinvestment opportunities at the time of any prepayment. On this record, we are satisfied that John Hancock met its burden of demonstrating that the make whole amount provisions to which the parties agreed when they executed the SPA, tying the make whole amount to the yield on United States Treasury securities

---

[11]Clean Harbors's expert, Donald Margotta, opined: "If a high yield corporate debt yield of 16% is readily available to the Defendant-Lenders at the time of prepayment, they sustain no loss because the 16% return they lost is replaced upon reinvestment. Certainly, at the time of contracting (April of 2001), there would be no way of knowing exactly what high yield corporate debt yields would be at the time of a future payment." Bruce McDonald, of Deutsche Bank, Clean Harbors's agent and advisor in connection with the SPA, confirmed that there was no way to determine with precision what John Hancock's losses would be in the event of prepayment because "you don't know exactly what they will be reinvesting in with the stated funds." As McDonald further explained: "[I]f they have to reinvest them in treasuries at low rates, then it will definitely result in a loss on their originally contemplated returns. If they are able to reinvest those funds in securities yielding similar rates of return, then it will not result in any loss."

[12]Edwin Roland, of Deutsche Bank, testified that "[t]he high yield market is a negotiated market" and concurred that mezzanine financing deals are highly negotiated. Clean Harbors did not refute John Hancock's report that "all of the defendants already had substantial liquidity awaiting investment as of September 2002, with the result that any prepayment by Clean Harbors would only add to their pool of 'low yield' investments." Also uncontroverted was the testimony of Howard Levkowitz, testifying on behalf of defendant Special Value Bond Fund, LLC, in explaining the fund's investment process: "Finding investments is a hard, time-consuming process. We spend a lot of time looking at one. When we make an investment we expect to keep it for a period of time."

at the time of prepayment and adjusted by 250 points, bore a rational relation to John Hancock's anticipated losses, based on the circumstances known to the parties at the time.

We reject, as did the judge, Clean Harbors's remarkable assertion that it did not understand the make whole amount provisions when it signed the SPA. The undisputed evidence was that prior to the SPA's execution, Clean Harbors' advisor, Deutsche Bank, made certain calculations based on the SPA's make whole amount formula and arrived at estimated make whole amounts ranging from $10.5 million to $14.35 million for prepayment within the first three years of the loan. Clean Harbors knew, or is imputed with the knowledge through its agent, Deutsche Bank, that, based on the SPA's formula, amounts in the range of $14 million might be owing as a contractual premium for prepayment in the first three years, whether in the event of voluntary prepayment or payment required by acceleration.[13] Clean Harbors also knew, through Deutsche Bank, that the amount owed would vary, depending on the Treasury rate at the time of prepayment and the duration of the loan prior to prepayment.

Yet nothing in the record indicates that Clean Harbors raised an objection to the make whole provisions, or instructed Deutsche Bank to negotiate the use of a different discount rate.[14] Rather, Edwin Roland of Deutsche Bank, who, prior to the execution of the SPA, estimated the possible make whole amounts under the Treasury rate plus 250 points formula, viewed the terms of the proposed financing as reasonable, rational, and within expectations of what Clean Harbors should expect to pay for mezzanine financing arrangements at that time. In the words of Michael Malm, Clean Harbors's counsel

[13]Though the record suggests otherwise, Clean Harbors claims that Deutsche Bank never shared the calculations with Clean Harbors's management. Based on Deutsche Bank's role as Clean Harbors' agent and advisor in the transaction, any dispute on this point would not be material, and Clean Harbors does not specifically argue to the contrary. See generally *Flynn* v. *Wallace*, 359 Mass. 711, 717-718 (1971) (knowledge possessed or obtained by a business's agent in relation to a transaction is imputed to its principal).

[14]We note, again, that the undisputed record here demonstrates that John Hancock's initial proposal did not permit prepayment within the first three years of the loan. It was Clean Harbors that sought to have a prepayment provision included in the parties' agreement.

and longtime clerk, Clean Harbors was "just happy to have" the deal.

Consequently, despite Clean Harbors's claim of ignorance, the record indicates that it had some notion, when it executed the SPA, of possible make whole amounts it would have to pay to John Hancock upon prepayment of the debt. Taken together, the undisputed facts confirm that Clean Harbors entered this transaction as a sophisticated borrower, with the assistance of counsel and financial advisors, and that Clean Harbors specifically sought to have included in the SPA the option to prepay the notes in the first three years of the loan, and then agreed to pay a contractual premium for the right. See, e.g., *Manganaro Drywall, Inc.* v. *Penn-Simon Constr. Co.*, 357 Mass. at 657 ("There is nothing to indicate that the disputed provision concerning interest was not negotiated on an arms-length basis between two substantial business firms"). Clean Harbors has failed to meet its summary judgment burden of setting forth specific facts to establish a genuine issue for trial on its claim that the make whole amount owing upon its voluntary prepayment of the notes bore no rational relation to John Hancock's anticipated losses. See Mass.R.Civ.P. 56(e), 365 Mass. 825 (1974). As a result, summary judgment in John Hancock's favor was properly entered on its claim for enforcement of the SPA's make whole amount provisions.

2. *Usury notices.* The parties agree that notices pursuant to G. L. c. 271, § 49, the usury statute, were filed by all the lenders with the Attorney General in connection with the loans under the SPA. Section 49(*d*) of c. 271 permits a lender to charge interest at a rate above twenty percent per annum so long as the lender files the requisite notification of its intent to enter into such a transaction.[15] It is also undisputed that here, three of the defendants — Special Value Bond Fund, LLC,

---

[15]General Laws c. 271, § 49(*d*), inserted by St. 1970, c. 826, provides, in relevant part: "The provisions of paragraph (*a*) to (*c*), inclusive, shall not apply to any person who notifies the attorney general of his intent to engage in a transaction or transactions which, but for the provisions of this paragraph, would be proscribed under the provisions of paragraph (*a*) providing any such person maintains records of any such transaction. Such notification shall be valid for a two year period and shall contain the person's name and accurate address. . . . Such records shall contain the name and address of the bor-

Arrow Investment Partners, and Bill and Melinda Gates Foundation — released loan proceeds to Clean Harbors in the morning of April 30, 2001, at Clean Harbors's request, but filed their notices with the Attorney General in the afternoon of the same day. Clean Harbors contends that those defendants, by releasing the funds before filing the notices, violated c. 271, § 49.

The judge ruled that the statute did not make clear whether notification had to be on file with the Attorney General's office prior to the closing. Clean Harbors contends, and we agree, that the statute is not ambiguous. Section 49(*d*) requires both that the Attorney General be notified in advance of the disbursement of loan funds (lender must "notif[y] the attorney general of his *intent to engage* in a transaction . . ." [emphasis supplied]; see note 15, *supra*), and that, subsequent to the closing, the lender must maintain records that include, inter alia, "the date the loan is made and the date or dates on which any payment is due." See *ibid.*

While it is true that § 49(*d*) itself does not specify when, in the loan process, the notification of intent must be filed, our cases have consistently construed the requirement to mean that the notice should be on file with the Attorney General by the time the loan proceeds are disbursed. See *Albano* v. *City Natl. Bank*, 11 Mass. App. Ct. 973, 973 (1981) (no violation where the "relevant notices which satisfied the requirements of G. L. 271, § 49(*d*) . . . were on file with the Attorney General prior to the times when the net proceeds of the loans were disbursed from escrow"); *Levites* v. *Chipman*, 30 Mass. App. Ct. 356, 362 (1991) ("Since this notice was on file at the time the loan proceeds were distributed . . . the interest rates provided in the promissory note were not illegal"); *Hakim Enterprises, Inc.* v. *Reinhardt*, 30 Mass. App. Ct. 911, 911 (1991) ("the defendants have failed to show that the notice was not on file with the Attorney General prior to the time when the loan was made, that is, when the money was first advanced").

As there is no dispute that the notifications of Special Value Bond Fund, LLC, Arrow Investment Partners, and Bill and

rower, the amount borrowed, the interest and expenses to be paid by the borrower, the date the loan is made and the date or dates on which any payment is due."

Melinda Gates Foundation were filed after the loan proceeds were disbursed, partial summary judgment on this claim should have been entered in Clean Harbors's favor. We note, however, that in a civil proceeding to enforce c. 271, § 49(*c*), the judge is afforded discretion to fashion an equitable remedy for the statute's violation. See *Beach Assocs.* v. *Fauser*, 9 Mass. App. Ct. 386, 389 (1980). The judge, on remand, may take into account all of the circumstances involved in the delay. We refer, in particular, to the judge's observations regarding the de minimis nature of the delay in filing the notices, and the reason the loan proceeds were disbursed prior to the filing, as these factors are relevant to the exercise of the judge's discretion, under equitable principles, in determining what relief is appropriate, if any, in these circumstances. See, e.g., *id.* at 394 ("It was within the discretion of the judge, based on all the facts, circumstances, and conditions surrounding the loan, to void it, to rescind it, to refund, to credit any excessive interest paid, to reform the contract, or to provide any other relief consistent with equitable principles").

3. *Cross appeal: attorney's fees.* The SPA, pursuant to § 12.1, provided for the lenders' recovery of "the costs and expenses, including reasonable attorneys' fees and the fees of any other special or financial advisers, incurred in evaluating, monitoring or enforcing any rights under the Transaction Documents or in responding to any subpoena or other legal process issued in connection with the Transaction Documents . . . ." The defendants challenge the amount of the judge's award, which was less than one-third of what they requested. The judge explained in his order that he did so based on the paucity of supporting documentation they provided.

The judge's March 15, 2004, "Memorandum Regarding Final Judgment in This and the Consolidated Case," made clear the steps the defendants were to take: "to serve upon Clean Harbors, Inc. and file with the Court any documentation supporting their claims for attorneys' fees and costs . . . ." The defendants, instead, served an application for costs and attorney's fees supported principally by an eight-page affidavit of their lead counsel, Brian A. Davis. In his affidavit, Davis provided an overview of the legal work he and nameless others at his law

firm performed, and offered to provide the judge with itemized invoices for in camera review. The defendants explain on appeal that they did not provide their billing records in support of their fee petition because those records contained numerous entries that disclosed privileged or confidential information.

Our courts have recommended that attorneys keep written time records for utilization in proving time expended by various attorneys on various issues. See *Mulhern* v. *Roach*, 398 Mass. 18, 26 n.11 (1986); *Salem Realty Co.* v. *Matera*, 10 Mass. App. Ct. 571, 577 n.5 (1980). Compare *Arlington Trust Co.* v. *Caimi*, 414 Mass. 839, 848 (1993) (though not a "condition precedent" to an award, "contemporaneous time records go a long way to document a claim for attorney's fees"). The defendants argue that they offered to submit such proof, though only on an in camera basis. We think it was reasonable for the judge, in the interest of fairness, to decline to accept and consider those records as proof, if they were not made available to opposing counsel for examination. See *Rothman* v. *Rent Control Bd. of Cambridge*, 37 Mass. App. Ct. 217, 223 (1994), quoting from Schwartz, Administrative Law § 7.13, at 369 (2d ed. 1984) ("the general principle [is] that '[w]hatever actually plays a part in the decision should be known to the parties and subject to being controverted' "). See generally *Lewis* v. *Lewis*, 220 Mass. 364, 370-371 (1915) (in camera proceedings in common-law courts are disfavored, as contrary to the spirit of openness, impartiality, and equality upon which our system of justice depends). And in the absence of such records, the judge was justified in declining to attempt to apply the requisite factors to the work of the various other attorneys and staff involved in representing the defendants.[16]

The judge observed that the evidence submitted by the

---

[16]The defendants do not explain why the portions of the billing records they claim contained privileged or confidential information could not have been submitted to the judge and opposing counsel with the privileged portions redacted. For example, in *United States* v. *Massachusetts Inst. of Technology*, 129 F.3d 681, 683 (1st Cir. 1997), a case cited by the lenders for another proposition, the defendant initially produced billing statements, in response to a document request, with privileged portions redacted. Presumably because the opposing party, the Internal Revenue Service (IRS), was seeking substantive communications rather than simply billing information, the case involved the IRS's attempt to obtain the redacted information. But we mention the case

defendants did not permit a full review of the relevant factors that have long provided the measure of reasonableness in Massachusetts fee awards. See, e.g, *Linthicum* v. *Archambault*, 379 Mass. 381, 388-389 (1979); *Berman* v. *Linnane*, 434 Mass. 301, 303 (2001). The judge concluded that, "[w]ithout details of who did the work, what was done, what was charged for it and how long it took, the Court is hard pressed to perform its not insignificant task in this case." The judge took into account the appropriate factors, but properly limited his consideration to only those factors on which evidence was presented. See, e.g., *ibid.*

"What constitutes a reasonable fee is a question that is committed to the sound discretion of the judge." *Id.* at 302-303. There was no abuse of discretion here. The judge awarded the lenders their lead counsel's rate and hours spent on the litigation, based on the details provided in his affidavit regarding his own efforts. The judge declined to award fees for work done by other attorneys who did not file affidavits and for whom specific information was lacking, reiterating that, "but for the hourly charges and rates for lead counsel, the Court has no idea of even who the other lawyers were who worked on the case, what they did, what their rates were and whether what they did, at those rates, was reasonable." Compare *Kennedy* v. *Kennedy*, 23 Mass. App. Ct. 176, 180 (1986) (party's reliance on affidavits was appropriate where the party opposing a fee award stipulated to the affidavits "in large part," and declined the opportunity to cross-examine attorneys who prepared affidavits, which were based upon contemporaneously prepared time records and detailed their hourly rates and time spent). The judge was similarly justified in rejecting the lenders' proof, or lack thereof, regarding the fees paid to their experts, again noting that the "meager record" did not support the request.

4. *Conclusion.* Summary judgment for the defendants is affirmed as to the enforceability of the make whole amount provisions of the Securities Purchase Agreement. Summary judgment

merely by way of pointing out that disclosing the relevant documentation with redactions would have gone a long way toward enabling the judge here to apply the relevant criteria, while permitting Clean Harbors the opportunity to examine and challenge the materials, without jeopardizing the defendants' attorney-client privilege.

for the defendants Special Value Bond Fund, LLC, Arrow Investment Partners, and the Bill and Melinda Gates Foundation is reversed as to their violation of G. L. c. 271, § 49. An order shall enter awarding Clean Harbors, Inc., summary judgment on that aspect of its amended complaint, and that matter is remanded to the Superior Court for determination of an appropriate remedy pursuant to G. L. c. 271, § 49(*c*). Finally, the award of attorney's fees and costs to the defendants is affirmed.

*So ordered.*